454 A.2d 92

**COMMONWEALTH of Pennsylvania,**

**v.**

**John W. DAVIS, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 29, 1982.

Filed Dec. 17, 1982.

Petition for Allowance of Appeal Denied Feb. 28, 1983.

206

Clarence D. Bell, Media, for appellant.

David E. Fritchey, Assistant District Attorney, Media, for Commonwealth, appellee.

Before SPAETH, WICKERSHAM and CIRILLO, JJ.

CIRILLO, Judge:

This is an appeal from the judgments of sentence imposed on the appellant, John W. Davis, Jr., on April 10, 1981, in the Court of Common Pleas of Delaware County. A jury convicted appellant of first-degree murder,[1] two counts of robbery,[2] and criminal conspiracy.[3] The court denied appellant's post-trial motions and sentenced him to life imprisonment for murder, ten to twenty years imprisonment for robbery to be served consecutively to the life sentence, and five to ten years imprisonment for conspiracy to be served concurrently with the robbery sentence. We affirm.

1. 18 Pa.C.S. § 2502(a).

2. *Id.* § 3701.

3. *Id.* § 903.

The evidence presented at trial, viewed in a light most favorable to the Commonwealth as verdict winner, shows the following:

On the evening of December 23, 1979, Father William Benonis and Joseph Hoffman were walking the short distance from the church building of St. Michael's Church in Chester to the rectory. Mr. Hoffman's wife was waiting for him outside the rectory. Father Benonis was carrying a case containing proceeds from a church bingo game, while Mr. Hoffman was carrying a tin box containing money from sales of refreshments at the game. Before Father Benonis and Mr. Hoffman reached the rectory, two men who had been sitting together near the church entrance approached and confronted them. One of the men poked a shotgun into Father Benonis's stomach. Father Benonis grabbed the gun and yelled, and threw the money case into a hedge near the rectory. One of the assailants began to run away, while the one with the shotgun went to retrieve the money case. As the gunman tried to escape, he came upon Joseph Hoffman, raised the shotgun and fired at very close range into Hoffman's left chest and shoulder. The gunman fled on foot. Father Benonis and Mrs. Hoffman ran immediately to Mr. Hoffman where he lay on the ground. When Chester Police arrived minutes later, Hoffman had no vital signs. He was taken to the hospital, where he was pronounced dead.

Police immediately began a search of the neighborhood around St. Michael's. About a block from the church, an officer came upon a man named Pat Martin walking on Eighth Street and asked him whether he had seen anyone running through the vacant lot behind the church. Martin told the officer he had seen three black males, one of whom appeared to be carrying a rifle and a radio-shaped object, running from St. Michael's through the lot. Martin said he then saw a late 1960's model Cadillac with a white top and temporary tags pick the three men up on Eighth Street. The car then sped down Eighth Street and made a turn, at which point Martin lost sight of it. Police also learned that

the car had a personalized front license plate with the letters "BOP" on it. A description of the car was called in to the police radio dispatcher. A short time later, a car fitting the description was found on Seventh and McIlvain Streets in Chester, about two blocks from where Martin had last seen the car. In the glove compartment, police officers found a temporary registration slip for the car in Davis's name. As officers were investigating the car, the appellant's brother, Bruce Davis, came upon the scene and asked the officers why they were searching his brother's car. Bruce Davis was detained, but released without questioning. Later, a fingerprint dusting of the car turned up some prints identified as those of the appellant.

Near the scene of the crime, police found a piece of gun metal and two waddings from shotgun shells. In the underbrush at Eighth and Madison Streets, police found a shotgun with its barrel split and a shell in one of its chambers. About five or six blocks from the church, police found a case containing church keys and checks made out to St. Michael's. With the case was a tin box. The case and box were identified as those Father Benonis and Hoffman had been carrying.

Later tests determined that John Davis's fingerprints were on the shotgun; that the shotgun was the one used to shoot Joseph Hoffman; that the piece of gun metal had come from the barrel of the shotgun; and that the shell waddings were consistent with the type of ammunition used in the shotgun.

Having culled this information from their investigation, police executed a criminal complaint and took out a warrant for Davis's arrest on January 9, 1980, charging him with the murder of Joseph Hoffman. On January 14, 1980, Davis went to the Detective Division of the Chester Police Department with his father to surrender himself on a second warrant based on unrelated burglary charges. Sergeant Randolph Dixon read Davis his constitutional rights and the second warrant. Davis answered "yes" when asked if he understood his rights, and "no" when asked if

he wanted a lawyer. Detective Daniel Iacono took Davis to be booked, then read him the arrest warrant stemming from the St. Michael's shooting and informed him that he was being charged with homicide, robbery and related offenses. Detective Iacono again read Davis his constitutional rights, and again Davis answered "yes" when asked if he understood his rights, and "no" when asked if he wanted a lawyer. Detective Iacono returned Davis to Sergeant Dixon for questioning on the burglary charges. Before Sergeant Dixon could begin questioning, Davis said, "The man is dead and if I go to jail, can I ask for the chair?" Despite Sergeant Dixon's warnings not to continue, Davis said, "Brown gave me the gun and told me it wasn't loaded. Brown, Bannister, and Slim Lee ran off and left me with the two men." Sergeant Dixon interrupted again to warn Davis not to say anything further, but Davis continued, "Brown, Lee ran off and left me. The man came after me, at me. The gun went off." Davis was hysterical and crying at this point. The arresting officers decided not to try to question Davis then, and summoned Davis's father into the room.

Davis presents several objections on appeal, all of which were ably dealt with and rejected in the learned trial Judge Melvin Levy's post-verdict opinion, and all of which we reject also.

The appellant first contends that the criminal complaint and affidavit of probable cause prepared by the police did not contain information sufficient to disclose probable cause for his arrest. Appellant argues that the warrant for his arrest was improperly issued, since the issuing authority had no probable cause upon which to base the warrant. He concludes that his arrest was illegal and that he should have been discharged from the outset.

 Appellant has not provided us with a copy of the original complaint, nor has he quoted from it to inform us of the precise nature of the defects of which he complains. However, we have determined that neither appellant's arrest nor his conviction is invalidated by the asserted defects

in the complaint. A warrantless arrest for a felony will be upheld where police have probable cause to believe (1) that a felony has been committed, and (2) that the person to be arrested is the felon. *Commonwealth v. Wagner,* 486 Pa. 548, 406 A.2d 1026 (1979). " 'Probable cause' is said to exist where facts and circumstances within the knowledge of the arresting officer are reasonably trustworthy and sufficient in themselves to warrant a man of reasonable caution to believe that the person to be arrested has committed the offense." *Commonwealth v. Jackson,* 450 Pa. 113, 117, 299 A.2d 213, 215 (1973). When appellant walked into the Chester Police Station on January 14, 1980, police already had probable cause to arrest him without a warrant. They knew that Joseph Hoffman had been shot and killed in the course of a robbery. They had determined that the shotgun found at Eighth and Madison Streets was the weapon used to shoot Hoffman. They had found appellant's fingerprints and a registration slip in appellant's name in a car that had been seen speeding away after picking up three black males, one of whom was carrying a long gun. These same three black males had been seen running from the scene of the crime. The appellant's brother had also indicated to police that the car belonged to the appellant. Although police did not have a detailed description of any of the robbers, the appellant fit the description they did have, insofar as he was a young black male of average size. Taken together, these were facts and circumstances sufficient to warrant a man of reasonable caution to believe that appellant had committed the offenses for which he was arrested. It is of no consequence that much of this information may not have been known to Sergeant Dixon at the time of the arrest. As long as the officers who oversee the investigation and order the arrest possess the information constituting probable cause, the fact that an officer making the arrest does not know personally of the information does not alter the validity of the arrest. *Wagner, supra; Jackson, supra; Commonwealth v. Thomas,* 269 Pa.Super. 409, 410 A.2d 322 (1979).

For these reasons, appellant's arrest on January 14 was legal, regardless of the validity of the arrest warrant.

■ The appellant's brief appears to treat the legality of his arrest and the validity of the complaint filed against him as one and the same issue. If these issues were one and the same, our determination that appellant's arrest was legal would also dispense with his objections to the form of the complaint. However, appellant's citation to Rule 150(b) of the Pennsylvania Rules of Criminal Procedure may fairly be held to raise the issue whether that rule required his discharge before trial due to a substantively defective complaint. Rule 150(b) provides:

> **Substantive Defects:** A complaint, citation, summons, or warrant contains a substantive defect, the defendant shall be discharged unless he waives the defect. Nothing in this rule shall prevent the filing of a new complaint or citation and the issuance of process in which the defect is corrected in a proper manner.

Assuming *arguendo* that the complaint in this case contained substantive defects, the appellant's proper relief would have been to obtain a discharge from the district justice, at which point the police could have rearrested appellant and filed a corrected complaint.[4] *Commonwealth ex rel. Fitzpatrick v. Mirarchi*, 481 Pa. 385, 392 A.2d 1346 (1978). But the fact that appellant did not succeed in obtaining a discharge at the district justice level is not a ground for now disturbing his conviction. *Commonwealth v. Krall*, 452 Pa. 215, 304 A.2d 488 (1973); *Commonwealth v. Mills*, 235 Pa.Super. 173, 340 A.2d 900 (1975). Just as in the *Mills* case, appellant's discharge would have resulted in nothing more than his rearrest and a new finding of probable cause. Thus, the district justice's refusal to discharge appellant did not prejudice him.

4. Indeed, it appears that the reason the original complaint was not transmitted to this Court as part of the record is that the complaint was never filed in the Delaware County prothonotary's office; instead, criminal informations were substituted for the complaint and filed before trial. Appellant has not challenged the sufficiency of the informations.

■ The appellant next objects to the conduct of the preliminary hearing, arguing that the district justice admitted appellant's incriminating statements without proof of the corpus delicti of the crime of murder. The rule of law relied on by appellant is that "an extra-judicial admission or confession of one accused of crime cannot be received in evidence unless and until the corpus delicti of the crime has first been established by independent proof." *Commonwealth v. Turza,* 340 Pa. 128, 133, 16 A.2d 401, 404 (1940). Appellant first argues that it was improper procedure for the district justice to admit appellant's incriminating statements *before* the cause of Joseph Hoffman's death had been independently proven. Technically, the language of the *Turza* case would seem to support this argument. However, the modern view, as expressed in *Commonwealth v. Smallwood,* 497 Pa. 476, 442 A.2d 222 (1982), is that the order of proof is a matter within the discretion of the hearing judge. In *Smallwood,* the trial judge had received the defendant's inculpatory statements into evidence before the corpus delicti of the crime had been proven. On appeal, the Supreme Court held that since the corpus delicti had been subsequently established through independent evidence, there was no error in the prior admission of the statements. *Smallwood,* of course, dealt with the order of proof at trial. Since, in our view, the difference in purpose between a preliminary hearing and a trial often dictates that evidentiary rules be relaxed at the hearing, *Commonwealth v. Rick,* 244 Pa.Super. 33, 366 A.2d 302 (1976), we have no difficulty in applying the *Smallwood* rule with even greater force in this case.

■ To establish the corpus delicti in a homicide case, it is necessary to show "that the person for whose death the prosecution was instituted is in fact dead and that the death occurred under circumstances indicating that it was criminally caused *by someone." Turza* 340 Pa. at 134, 16 A.2d at 404. Appellant maintains that this corpus delicti requirement was never properly met at the preliminary hearing because the Commonwealth used a hearsay autopsy report

to establish Joseph Hoffman's death and cause of death. We reject this argument on the basis of *Commonwealth v. Rick, supra.* In *Rick,* a drunk-driving case, the appellant objected that the only evidence of his intoxication offered by the Commonwealth at the preliminary hearing was a hearsay blood-alcohol report. This Court held that the blood-alcohol report was admissible, at least so long as it appeared the Commonwealth would be able to produce at trial the chemist who had prepared the report. In *Commonwealth v. Branch,* 292 Pa.Super. 425, 437 A.2d 748 (1981), the court went even further. Branch was being held for a shooting. A police officer was allowed to testify at the preliminary hearing that he had been told by the shooting victim's brother that Branch had done the shooting. The court, relying on *Rick* as controlling precedent, held that the district justice had committed no error in admitting this obvious hearsay.

■ Appellant cites *Commonwealth v. Seville,* 266 Pa.Super. 587, 405 A.2d 1262 (1979), for the proposition that we should draw a distinction between a routine procedure such as a blood-alcohol test and a complex procedure requiring sophisticated analysis and opinion such as the autopsy involved in this case. We agree that this distinction is valid for some purposes, but *Seville* is simply inapposite to the issue decided here. That decision merely declined to extend the hospital records exception to the hearsay rule to medical reports requiring professional diagnoses and opinions. Here, we are not making an exception to the hearsay rule. We are following *Branch* and *Rick* in holding that a hearsay autopsy report is admissible at a preliminary hearing to prove the cause of death in a homicide case.[5]

■ The appellant next assigns error in the trial court's refusal to suppress his incriminating statements. Appellant bases part of his argument on *Wong Sun v. United States,*

[5] We note that the preparer of the autopsy report did in fact testify at appellant's trial. We do not pass judgment on the admissibility of evidence suffering from a hearsay defect that will not be cured at trial.

371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In light of our determination that appellant's arrest was perfectly legal, the *Wong Sun* issue does not arise, and the argument that appellant's statements were the fruit of an illegal arrest is dismissed.

■ However, appellant also argues that he never explicitly waived the right not to incriminate himself, and that *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that his statements be suppressed. Appellant's reliance on *Miranda* is dubious in view of the holding in *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), which recognized that an implicit waiver of constitutional rights could be effective. But, as appellant correctly points out, the Pennsylvania Supreme Court has indicated its unwillingness to follow *Butler*. In *Commonwealth v. Bussey*, 486 Pa. 221, 404 A.2d 1309 (1979), the Court held that the Pennsylvania Constitution requires an *explicit* waiver of constitutional rights. Nevertheless, appellant is wrong in maintaining that he never explicitly waived his rights. The record shows that appellant answered "yes" to police questions whether he understood his rights, and "no" when asked whether he wanted an attorney. In *Commonwealth v. Webb*, 491 Pa. 329, 421 A.2d 161 (1980), the Supreme Court held that yes/no answers to *Miranda* warnings are a sufficiently explicit waiver of constitutional rights. In the instant case, the trial court held that appellant "made a knowing, intelligent, and explicit waiver of his constitutional rights" before making his incriminating statements. *Commonwealth v. Davis*, 69 Del.Co.Rep. 125, 132. The fact that appellant may have been very upset upon learning he was being charged with homicide is understandable, but that fact alone does not vitiate the trial court's finding. Accordingly, we hold that there was no error in the admission of appellant's statements.

■ Finally, appellant contends that the evidence adduced at trial was insufficient to convict him of first-degree murder, robbery, and conspiracy. Our standard of review

on this issue is whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find every element of the crimes charged. *Commonwealth v. Pronkoskie*, 498 Pa. 245, 445 A.2d 1203 (1982).

We have already held that appellant's statements to police were admissible. The statements contained admissions that appellant had been the gunman in the St. Michael's robbery. The jury was entitled to find that appellant had in fact been the gunman based on these statements, since there was no showing necessitating a finding that the statements were false.

Therefore, appellant's only remaining serious objection to the sufficiency of the evidence on the murder charge is that the Commonwealth did not prove he had a specific intent to kill, a necessary element of the crime of murder of the first degree.[6] 18 Pa.C.S. § 2502(a). The Supreme Court has repeatedly held that circumstantial evidence that the defendant used a deadly weapon on a vital part of the decedent's body is sufficient to support the inference that the defendant intended the victim's death. *Commonwealth v. Green*, 493 Pa. 409, 426 A.2d 614 (1981); *Commonwealth v. Bishop*, 489 Pa. 96, 413 A.2d 1031 (1980); *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976). The reason for this rule is that direct proof of an actor's intent is usually impossible. In the absence of such direct proof, the factfinder may infer that the actor intended the natural and probable consequences of his act. *O'Searo* 466 Pa. at 238–39, 352 A.2d at 37. The testimonies of Father Benonis and Mrs. Hoffman indicate that the gunman, after retrieving Father Benonis's money case from the hedge, came upon Joseph Hoffman, raised the shotgun and fired at a

---

6. "The term 'specific intent to kill' is a phrase that has been developed by the courts of this jurisdiction to express the state of mind which characterizes the intent which accompanies a killing which is willful, deliberate and premeditated, as required by the statute." *Commonwealth v. O'Searo*, 466 Pa. 224, 234, 352 A.2d 30, 35 (1976).

range of no more than a couple feet, striking Hoffman in the left shoulder and neck. A natural and probable consequence of this act was the death of Joseph Hoffman. It was permissible for the jury to infer that appellant, the gunman, had the specific intent to kill Hoffman.

█ The appellant, relying on his oral statements to police, argues that the inference of specific intent to kill was contradicted by evidence that the gun went off accidentally and that he did not know it was loaded. A jury is free to believe all, part, or none of a defendant's statements or confessions. *Commonwealth v. Hornberger*, 441 Pa. 57, 270 A.2d 195 (1970). The jury in this case obviously did not believe the self-serving declarations in appellant's statements. The only other evidence appellant cites in support of his theory that the gun went off accidentally is testimony of the medical examiner who performed the autopsy on Joseph Hoffman that Hoffman's hand had been injured, possibly when the shotgun blew up. This evidence is no more consistent with appellant's theory than with the theory that appellant fired intentionally when Hoffman grabbed the gun. But it is not our function to dictate which among various possible inferences the jury must draw. *See, Commonwealth v. Kearney*, 459 Pa. 603, 331 A.2d 156 (1975). The testimonies of both Father Benonis and Mrs. Hoffman indicate that the gunman deliberately raised the gun and fired. The jury was free to believe these witnesses. The evidence of first-degree murder was sufficient to support the verdict.

Appellant's challenges to the sufficiency of the evidence on the robbery and conspiracy charges are also meritless. The evidence shows that Father Benonis saw two men approaching from a distance, quickening their pace as they came. The men confronted him, one of them by poking him with a shotgun. The Father's shouting chased one assailant away, but the one with the shotgun took the priest's money case before leaving. The gunman fled with his companions after shooting Joseph Hoffman. Although no witness remembered seeing the gunman taking Hoffman's

tin box with the kitchen proceeds in it, police found the box along with the money case about five or six blocks from the scene of the crime. Both the box and the case had been emptied of money. We find this evidence sufficient to support findings that appellant robbed both Father Benonis and Mr. Hoffman, and that appellant illicitly agreed with at least one other person to commit the robberies.[7]

Accordingly, the judgments of sentence are affirmed.

SPAETH, J., concurs in the result.

**7.** As we have already indicated, the evidence was sufficient to support the conclusion that appellant was the gunman.