482 A.2d 1023

**COMMONWEALTH of Pennsylvania**

v.

**James GILLESPIE, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 9, 1983.

Filed Oct. 5, 1984.

Petition for Allowance of Appeal Granted for Commonwealth March 8, 1985.

Petition for Allowance of Appeal Denied for Appellant March 8, 1985.

578

John J. Cerra, Carbondale, for appellant.

Ernest D. Preate, Jr., District Attorney, Scranton, for Commonwealth, appellee.

Before BROSKY, CIRILLO and LIPEZ, JJ.

BROSKY, Judge:

This is an appeal from the order of the court below denying appellant's petition under the Post Conviction Hearing Act (PCHA).[1] Although appellant states only three questions in his statement of questions presented,[2] he raises

1. 19 P.S. § 1180–1 et seq., reenacted as 42 Pa.C.S.A. § 9541 et seq.

2. Appellant's statement of questions presented is as follows:

twenty-one grounds for relief, including a claim that the sentencing court placed him twice in jeopardy by imposing a consecutive sentence for robbery together with a life sentence for murder when the murder verdict could have been predicated on the felony murder doctrine. We find that appellant has waived all but his double jeopardy claim, but find merit to that claim and accordingly vacate the sentence imposed for robbery.

In 1969, appellant robbed a gas station, taking $130.41 in cash. He then abducted the gas station attendant and drove him twelve miles to an isolated area, where he shot the attendant to death.

On June 28, 1972, a jury found appellant guilty of first-degree murder and armed robbery and set the punishment for murder at life imprisonment. Post-verdict motions were filed and denied and appellant was sentenced to five to ten years for robbery, to run consecutively to the life term for murder. Appellant appealed to the Pennsylvania Supreme Court which affirmed the convictions *per curiam.*

Appellant subsequently filed a habeas corpus petition in the United States District Court for the Middle District of Pennsylvania. The federal court appointed counsel to represent appellant on the petition and on October 21, 1976 denied the petition without a hearing. The United States Court of Appeals for the Third Circuit affirmed without opinion and the United States Supreme Court denied appellant's petition for certiorari.

On June 13, 1979 appellant filed a PCHA petition and was appointed counsel by the PCHA court. After a hearing, the court denied the petition. This timely appeal followed.

*Issue I*—Whether or Not Appellant Has Waived His Right to Raise Certain Issues By Way of A Petition Under the Post Conviction Hearing Action, 19 P.S. 1180–1 et seq.

*Issue II*—Whether or Not the Sentencing Court Violated the Double Jeopardy Provision of the United States Constitution By Imposing a Consecutive Sentence for the Armed Robbery Conviction.

*Issue III*—Whether or Not Various Matters Raised at the Insistance [sic] and Behest of Appellant Require the Court to Grant Relief to Appellant In this Case.

■ Appellant's petition to the PCHA court alleged thirty-one grounds for relief of which twenty-one are pursued in this appeal. The Commonwealth argues that, under § 1180–4 of the PCHA, appellant has waived all of these issues by failing to present them either in the original proceedings before the Pennsylvania courts or in the federal habeas corpus proceedings.[3] However, we need not resolve this issue because we find that appellant has waived twenty of his claims due to the inadequacy of his presentation of those claims for our review and that his challenge to the sentence cannot be waived.

As to the twenty claims we find waived, we note that Pa.R.A.P. 2116(a) requires that a brief contain a statement of questions involved and further provides as follows:

> The statement of the questions involved must state the question or questions in the briefest and most general terms, without names, dates, amounts or particulars of any kind. It should not ordinarily exceed 15 lines, must never exceed one page, and must always be on a separate page, without any other matter appearing thereon. This rule is to be considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby ...

Appellant's brief presented the following as his third question of his statement of questions involved:

> Whether or Not Various Matters Raised at the Insistance [sic] and Behest of Appellant Require the Court to Grant Relief to Appellant In this Case.

3. Section 1180–4, now section 9544 of the PCHA provides in relevant part that:

> (b) for purposes of this act, an issue is waived if: (1) The petitioner knowingly and understandingly failed to raise it and it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or any other proceeding actually conducted, or in a prior proceeding actually initiated under this act; and (2) The petitioner is unable to prove the existence of extraordinary circumstances to justify his failure to raise the issue.
> (c) There is a rebuttable presumption that a failure to appeal a ruling or to raise an issue is a knowing and understanding failure.

This question defines no specific issue for appellate review or determination.

Pa.R.A.P. 2118 requires that the brief contain a summary of argument as follows:

The summary of argument shall be a concise summary of the argument of the party in the case, suitably paragraphed. The summary of argument should not exceed one page and should never exceed two pages. The summary of argument should not be a mere repetition of the statement of questions presented. The summary should be a succinct, although accurate and clear picture of the argument actually made in the brief concerning the questions.

Appellant's summary of argument with respect to the above question is as follows: Appellant asserts that the Court erred as regards various matters which are now raised at Appellant's behest and insistance. [sic]

This summary amounts to nothing more than a repetition of the above question.

Finally, appellant's argument with respect to the above question consists essentially of twenty numbered paragraphs, few longer than one sentence long, containing what amount to bald assertions of trial counsel's ineffectiveness or court error.[4]

When issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review, a court will not consider the merits thereof. *Commonwealth v. Sanford,* 299 Pa.Super. 64, 67, 445 A.2d 149, 150 (1982); see *Commonwealth v. Jackson,* 494 Pa. 457, 431 A.2d 944 (1981).

We find appellant's brief to be completely inadequate as to the twenty claims raised by his third question, and, therefore, will not reach its merits.

---

**4.** For example, in paragraph 10, appellant states the following:

10. Trial counsel failed to object and move for a mistrial as regards the charge of the jury on the issue of flight and the prosecutor's remarks as regards flight of Appellant.

This statement constitutes the entire argument on the issue raised in it.

■  However, appellant's double jeopardy claim is properly raised and developed in his brief.  Moreover, such a claim raises the issue of the lawfulness of the sentence imposed upon his convictions.  See *Commonwealth v. Walker*, 468 Pa. 323, 362 A.2d 227 (1976).  Since claims of illegality of sentence cannot be waived, this issue is properly before us, whether or not it would otherwise be considered waived under the PCHA.  *Commonwealth v. Albertson*, 269 Pa.Super. 505, 410 A.2d 815 (1979).

■  Appellant bases his claim on the cases of *Commonwealth v. Tarver*, 493 Pa. 320, 426 A.2d 569 (1981) and *Commonwealth v. Sparrow*, 471 Pa. 490, 370 A.2d 712 (1977).  In *Tarver*, the Pennsylvania Supreme Court held that the Double Jeopardy Clause of the United States Constitution,[5] in its protection against multiple punishments for the same offense,[6] prohibits the imposition of consecutive sentences for felony murder and its underlying felony.  According to the *Tarver* Court, felony murder and its underlying felony are the same offense for sentencing purposes.

Both Tarver and appellant were convicted of first degree murder under the Act of June 24, 1939, P.L. 872 § 701, which provided

All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree.  All other kinds of murder shall be murder in the second degree.

The 1939 Act identified two distinct categories of first degree murder:  murder accomplished by "willful, deliberate, and premeditated killing," and murder "committed in the perpetration of, or attempting to perpetrate any arson,

5.  U.S. Const. Amend V.

6.  See *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).

rape, robbery, burglary, or kidnapping." The latter category is commonly known as "felony murder." [7]

Tarver clearly was convicted of first degree murder of the felony murder variety. In the course of a bank robbery involving Tarver and two co-felons, a customer was shot and killed. Tarver pled guilty to murder and, at a degree-of-guilt hearing was adjudged guilty of first degree murder based on a finding the killing was perpetrated in the course and in furtherance of the robbery. He ultimately received a life sentence for the conviction. He also was tried and convicted on other charges, including robbery and was sentenced to ten to twenty years on the robbery count, to be served consecutively to the life term. On appeal, the Supreme Court then vacated the robbery sentence as violative of the Double Jeopardy Clause.

Instantly, appellant argues that the jury's verdict was possibly based on the felony murder doctrine and that this possibility brings his case within the *Tarver* rule. This possibility was injected into the case by the trial court's charge to the jury:

If you find, beyond a reasonable doubt, that the defendant, James Gillespie, while in the perpetration, or an attempt to perpetrate a robbery, as I have defined it, did violence to the person of William Gilmour by firing bullets into his body, thereby causing his death, then you should return a verdict of murder in the first degree.

If you find, beyond a reasonable doubt, that the defendant, James Gillespie, regardless of whether a robbery was perpetrated, or attempted, did willfully, deliberately, and with premeditation, as defined by the court, shoot and kill William Gilmour, then you should return a verdict of murder in the first degree.

The jury returned a general verdict of guilty of first degree murder without specifying upon which of the alternative

7. Felony murder is presently classified as murder of the second degree. 18 Pa.C.S.A. § 2502(b).

charges they had relied. Thus, there is no way of knowing on which theory the jury proceeded.[8]

*Tarver*, however, is not necessarily alone dispositive of the instant case since there it was certain that the conviction of first degree murder was based on the felony murder doctrine. The question before us is whether the *Tarver* rule applies where there is only a *possibility* that the verdict was predicated on the felony murder doctrine.

We believe that the case of *Commonwealth v. Sparrow*, 471 Pa. 490, 370 A.2d 712 (1977) compels us to answer this question in the affirmative. In *Sparrow*, the Supreme Court, faced with the same type of jury instructions and verdict as appear instantly, stated:

> There was ample evidence in the case (such, for example, as Sparrow's announced purpose, "I'm going to get me a homicide") from which the jury could find that the slaying of Joseph Jaworski was wilful, deliberate and premeditated. Were that the basis of the verdict of murder in the first degree, there would be no room for the double jeopardy argument. But the jurors were charged that they could also return that verdict if they determined that the killing occurred during the commission of a robbery. Since there is no way of knowing on which theory the jury proceeded, we must consider appellant's contention that the robbery offense, if it lay behind the murder verdict, merged into the offense of murder and is not separately punishable.

*Sparrow*, 471 Pa. at 502, 370 A.2d at 720. However, the *Sparrow* court went on to hold that the imposition of a consecutive sentence for robbery, even if it lay behind the murder verdict, did not violate the doctrine of merger or the Double Jeopardy Clause. Thus, if the instant case were governed by *Sparrow*, appellant would not prevail.

■ However, *Tarver*, in holding that felony murder and its underlying felony are the same offense for sentencing

---

**8.** The Commonwealth itself concedes in its brief that it "is impossible to decipher whether the jury relied on the court's first or second charge concerning a finding of Murder in the First Degree.

purposes, expressly overruled *Sparrow's* contrary holding. We conclude, therefore, that a consideration of *Sparrow* and *Tarver* together produces the following rule: if there is no way of knowing on which theory (felony murder or willful, deliberate and premeditated murder) the jury based its verdict of first degree murder, a sentence may not be imposed both for the murder conviction and for the felony that would be the underlying offense were the murder conviction considered to be based on a theory of felony murder.

However, since *Tarver* was decided after appellant's conviction had become final, the preceding rule would not apply unless *Tarver* is to be given full retroactive effect. This question is one of first impression.[9]

> In *Commonwealth v. Godfrey*, 434 Pa. 532, 254 A.2d 923 (1969), our Supreme Court adopted the standards to be followed in determining whether to retroactively apply a decision in a criminal case. The court relying upon *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); and *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) required a number of factors to be considered. The court must review the purpose of the standard, the reliance place upon prior decisions, and the effect upon the administration of justice.

*Commonwealth v. Parrott*, 287 Pa.Super. 83, 87, 429 A.2d 731, 733 (1981).

> We do not believe that this case readily lends itself to the analysis established in *Linkletter*. Certainly, there is nothing in *Linkletter* or those cases following it to indicate that all rules and constitutional interpretations arising under the first eight Amendments must be subjected to the analysis there enunciated.

. . . . .

**9.** In *Commonwealth v. Starks*, 304 Pa.Super. 527, 450 A.2d 1363 (1982), *Tarver* was made retroactive to the extent that it was held to apply to cases on direct appeal at the time it was decided.

*Linkletter* indicated, for instance, that only those procedural rules affecting "the very integrity of the factfinding process" would be given retrospective effect. 381 U.S. at 639 [85 S.Ct. at 1743], 14 L.Ed.2d 601. In terms of some nonprocedural guarantees, this test is simply not appropriate. In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), for example, this Court held that in the situation there presented imposition of the death penalty was not constitutionally permissible. Yet, while this holding does not affect the integrity of the factfinding' process, we have not hesitated to apply it retrospectively without regard to whether the rule meets the *Linkletter* criteria. E.g., *Walker v. Georgia*, 408 U.S. 936, 92 S.Ct. 2845, 33 L.Ed.2d 753 [ (1972) ].

The prohibition against being placed in double jeopardy is likewise not readily susceptible of analysis under the *Linkletter* line of cases.

.　　.　　.　　.　　.

The guarantee against double jeopardy is significantly different from procedural guarantees held in the *Linkletter* line of cases to have prospective effect only. While this guarantee, like the others, is a constitutional right of the criminal defendant, its practical result is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial.[10] *Robinson v. Neil*, 409 U.S. 505, 507–508, 93 S.Ct. 876, 877–8, 35 L.Ed.2d 29, 32–33 (1973).

This holding was put in a broader perspective in the case of *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). There the Court stated the following:

... the Court has recognized full retroactivity as a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first

---

**10.** While, instantly, a different aspect of double jeopardy is at issue—that of the prohibition against multiple punishments for the same offense—its practical result is still not to prescribe procedural rules that govern the conduct of a trial.

place. The Court has invalidated inconsistent prior judgments where its reading of a particular constitutional guarantee ... serves "to prevent [his] trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of [that] trial," *Robinson v. Neil*, 409 U.S., at 509, 93 S.Ct., at 878 (double jeopardy). In such cases, the Court has relied less on the technique of retroactive application than on the notion that the prior inconsistent judgments or sentences were void *ab initio*.

*Id.*, at 550, 102 S.Ct. at 2587–88, 73 L.Ed.2d at 214.

The principles of *Robinson* and *Johnson* were recognized by this court in *Commonwealth v. Beam*, 227 Pa.Super. 293, 324 A.2d 549 (1974), where we stated that:

The cases in which double jeopardy principles have been given retroactive application have involved situations wherein a second prosecution or punishment was deemed to constitute jeopardy for the same offense. *Retroactive application* of these decisions *was required* in order to enforce the traditional Fifth Amendment ban on double punishment and successive prosecutions for the *same offense*.

*Id.*, 227 Pa.Superior Ct. at 300, 324 A.2d at 553 (emphasis added) (citations omitted).

As noted earlier, the *Tarver* court's decision was that the double jeopardy clause, in its protection against multiple punishments for the same offense, prohibits the imposition of consecutive sentences for felony murder and its underlying felony. We believe that the preceding discussion makes it abundantly clear that such a decision must be given full retroactive effect.[11]

11. Unlike the case at bar, the Pennsylvania Supreme Court cases relied on by the dissent in support of its position that *Tarver* should not be applied retroactively involve procedural rule changes. Thus, they are clearly inapposite to the instant case.

Since the instant case thus falls within the rule prescribed above, we must vacate the sentence of five to ten years on the robbery conviction.[12] It is so ordered.

12. The dissent would distinguish *Sparrow* on the basis that there the evidence could rationally and legitimately support a finding that the defendant did not specifically intend the death of his victim while here it could not. We believe this is a false distinction.

The dissent's argument misses the point that no matter how great the quantum of evidence may be to support such a finding, a contrary finding by the jury would *always* be legitimate, for it is *solely* the jury's province to determine the quality of that evidence. We do not, as the dissent mistakenly believes, refer here to the jury's traditional power to exercise mercy, but to its basic and exclusive function of assessing the credibility of the testimony. A jury is free to believe all, part or none of the evidence. *Commonwealth v. Tate,* 485 Pa. 180, 401 A.2d 353 (1979). Thus, no matter how unequivocally the dissent believes the evidence proved premeditated murder, it was within the province of the jury to disbelieve evidence that the appellant specifically intended the death of his victim. Essentially, the dissent would have us weigh the evidence and determine that the jury either must have or should have found that appellant was guilty of wilful, deliberate premeditated murder. This we cannot do.

On appellate review of a criminal conviction, we will not weigh the evidence and thereby substitute our judgment for that of the finder of fact. *Commonwealth v. Woodhouse,* 401 Pa. 242, 261, 164 A.2d 98 (1960). To do so would require an assessment of the credibility of the testimony and that is clearly not our function. *Commonwealth v. Sullivan,* 436 Pa. 450, 456, 263 A.2d 734 (1970) cert. denied, 400 U.S. 882, 91 S.Ct. 127, 27 L.Ed.2d 120; *Commonwealth v. Schuck,* 401 Pa. 222, 228, 164 A.2d 13 (1960), cert. denied, 368 U.S. 884, 82 S.Ct. 138, 7 L.Ed.2d 188 (1961).

*Commonwealth v. Paquette,* 451 Pa. 250, 257, 301 A.2d 837, 841 (1973). Thus, as in *Sparrow,* we are left unable to rule out the possibility that the jury based its verdict of first-degree murder solely on the felony-murder doctrine.

We also fear that the dissent greatly exaggerates the import of our decision. Certainly, the dissent concedes that, under *Sparrow,* the rule of *Tarver* would apply to unspecified verdicts where it would determine that the evidence could legitimately support a finding that the defendant did not intend the death of the deceased. Our decision would extend that rule only to what must certainly be the much smaller number of cases involving unspecified verdicts in which the dissent would determine that the evidence could not support such a finding.

It would seem, therefore, that the dissent's quarrel is more with the Supreme Court decisions of *Sparrow* and *Tarver* than with us. Moreover, we believe the welfare of society is, perhaps, better served when our decisions are based on precedent and Constitutional guarantees rather than on an unnamed assistant district attorney's statements as to parole policy. However, in an effort to further allay the dissent's

Order of the PCHA court affirmed in part and reversed in part. Jurisdiction relinquished.

CIRILLO, J., filed a dissenting opinion.

CIRILLO, Judge, dissenting:

I dissent from the vacation of appellant's robbery sentence. The double jeopardy rule of *Commonwealth v. Tarver*, 493 Pa. 320, 426 A.2d 569 (1981), should not be extended to this case.

In *Tarver* the Pennsylvania Supreme Court held that the Fifth Amendment guarantee against multiple punishments for the same offense protects a defendant from receiving consecutive sentences for felony-murder and the underlying felony. The Court found that the nature of felony-murder as developed under common law and by statute compelled the conclusion that felony-murder and its underlying felony were the "same offense" for double jeopardy purposes.

Under the common law, murder was distinguished from other types of homicide by the element of malice. In the case of felony-murder the necessary malice was not express, but implied. The common law felony-murder rule permitted the factfinder, in the case of a killing occurring during a felony, to "constructively infer" the essential element of malice from the actual malice accompanying perpetration of the underlying felony. *Commonwealth ex rel. Smith v. Myers*, 438 Pa. 218, 261 A.2d 550 (1970).

The statute under which appellant and Tarver were convicted did not alter the common law definition of murder, but divided the crime into two degrees. Murder of the first degree encompassed two subcategories: "willful, deliberate and premeditated" killing, and felony-murder. Any murder not falling into either of these categories was murder of the second degree. Act of June 24, 1939, P.L. 872, § 701.

Tarver was convicted after a degree-of-guilt hearing at which a three-judge court specifically found him guilty of

fears we note that a parole board in making its decision *must* investigate and inform itself of the circumstances of the offense and must consider the recommendations of, *inter alia,* the trial judge and the district attorney. 61 P.S. § 331.19.

felony-murder. Later he was convicted and sentenced consecutively for the underlying robbery. On appeal from the sentence for robbery the Supreme Court reasoned that the robbery had supplied not only the malice essential to make the accompanying killing murder, but also the aggravating factor necessary to raise the murder to murder of the first degree. Thus unable to separate first-degree felony-murder from its underlying felony, the Court found a constitutional prohibition against consecutive punishments for each crime.

Appellant's case diverges quite markedly from *Tarver*, both on the facts and in analysis.

Appellant robbed a gas station at gunpoint, stole the cash register containing $130 in cash, abducted twenty-year-old Billy Gilmour, the gas station attendant, and drove him twelve miles to an isolated area. There, despite repeated pleas by young Gilmour for his life, appellant fired six bullets into Gilmour's head and body. When Gilmour continued to writhe, appellant beat him over the head with a tire iron, then kicked Gilmour's body over an embankment.

The only direct testimony as to the brutal and merciless manner in which appellant killed Gilmour came from Edward Zigga, a trusty at the county prison where appellant was incarcerated. According to Zigga appellant not only related to him the sordid details of the crimes, but also solicited Zigga's help in having appellant's wife killed because of her knowledge about the crimes. Zigga's story of how the killing occurred was fully borne out by the medical, physical, and photographic evidence introduced at trial to prove the cause of Gilmour's death and the condition and location of his body when found.

Clearly the evidence at appellant's trial established beyond any conscionable doubt that whoever killed Gilmour specifically intended to kill him. In other words, that the killing was willful, deliberate, and premeditated. *Commonwealth v. Davis*, 308 Pa.Super. 204, 454 A.2d 92 (1982). The majority now allows that, nevertheless, the jury may have ignored the plain evidence of intent and pronounced appel-

lant guilty of first-degree murder solely on a felony-murder theory. Consistently with the *Tarver* analysis, then, what the majority is saying is that we must consider Gilmour's murder as the "same offense" as robbery because the jury might have chosen to "constructively infer" that the killing was malicious from the evidence that appellant robbed a gas station twelve miles down the road from the murder scene. I see no need to give appellant the benefit of such an unreasonable and phantom doubt as to what the jury found.

The majority conjures its doubt from the trial court's alternative first-degree murder instructions, which told the jury they could convict appellant if they found *either* that he fired the killing bullets "while in the perpetration" of a robbery, *or* that he killed Gilmour willfully, deliberately, and with premeditation. These "alternative" legal theories, however, in this case had a single factual theory to which they could apply. Gilmour was shot six times from behind in the head and body and also clubbed over the head with a tire iron. If the jury in finding appellant guilty placed any reliance on the felony-murder theory, under the charge they had to attribute at least the shooting to him. As the Supreme Court said in *Commonwealth v. Green*, 294 Pa. 573, 584, 144 A. 743, 747 (1929), "We can imagine no act more strongly indicative of an intent to kill than the deliberate shooting of a bullet into another's head. From such circumstances without qualifying facts the presumption of fact that the slayer intended to take life must arise in a reasoning mind...." The factual presumption of intent logically increases sixfold in this case, where the killer used six bullets instead of one. *See also Commonwealth v. Glass*, 486 Pa. 334, 405 A.2d 1236 (1979); *Commonwealth v. Prenni*, 357 Pa. 572, 55 A.2d 532 (1947); *Commonwealth v. Drum*, 58 Pa. 9 (1868); *but see Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976); *cf. Commonwealth v. Sullivan*, 472 Pa. 129, 371 A.2d 468 (1977) (evidence of brutality of killing probative of specific intent to kill).

Even assuming, then, that appellant's jury found guilt on the theory that he killed "in the perpetration of a robbery," is it conceivable that they scrupulously avoided the question whether appellant, while pumping six bullets into Gilmour, intended the boy's death? Such a conceit is, I believe, a chimera, and a flimsy ground for dissolving a serious felony sentence. An intentional homicide committed in the course of a felony is nonetheless first-degree murder of the willful, deliberate, and premeditated variety, *see Commonwealth v. Davis, supra; Commonwealth v. Olds,* 322 Pa.Super. 442, 469 A.2d 1072 (1983), and that is the variety of murder we are dealing with here.

The majority believes that *Commonwealth v. Sparrow,* 471 Pa. 490, 370 A.2d 712 (1977), compels us to doubt that appellant's jury found intent to kill. I disagree. In *Sparrow* the trial court gave an alternative first-degree murder charge similar to the one given in this case. But Sparrow killed his victim with one shot while holding him up on the street. The Supreme Court pointed out that while there was ample evidence in the case to support a finding of willful, deliberate, and premeditated slaying, the Court could not rule out that the jury had based its verdict solely on the felony-murder doctrine. Of course, the evidence in *Sparrow* could rationally and legitimately support a finding that the defendant did not specifically intend the death of his victim. That is emphatically not the case here, as even appellant's counsel in his closing statement to the jury conceded:

I'm sure there's not one of you in the jury box ... that will disagree with the opening statement that Mr. Brooks made to you people when this trial began a week ago yesterday, when he talked about what a horrible crime it was, what an execution it was, and we completely and totally agree, to that extent, with the district attorney. *There can be no question in anyone's mind* that this was a horrible, horrible, ruthless, cold-blooded murder, the killing of young Billy Gilmour.

(Emphasis mine). It was not felony-murder but willful, deliberate, premeditated murder for which appellant was convicted, and I cannot subscribe to any legal argument that would characterize it as the "same offense" as robbery.[1]

In addition, the majority ignores a sound jurisprudential reason why the *Tarver* double jeopardy rule should not be extended to this case. By giving the benefit of the rule to appellant, the majority has decided that the rule will be available to any petitioner regardless whether his conviction was final at the time *Tarver* was announced. Although this Court has held that relief on *Tarver* grounds must be

---

**1.** The majority misses the point when it says in footnote 12 of its opinion that a jury finding of felony-murder "would *always* be legitimate." Nobody is denying that a jury is empowered to return any verdict it sees fit if circumstances warrant. For example, a jury may exercise uncontrolled leniency to lessen the degree of the crime proven, or even acquit the defendant, although the verdict be manifestly inconsistent with the evidence. *See Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142, *cert. denied,* 419 U.S. 1000, 95 S.Ct. 316, 42 L.Ed.2d 274 (1974); *Commonwealth v. Staples,* 324 Pa.Super. 296, 471 A.2d 847 (1984); *but see Commonwealth v. Carter,* 502 Pa. 433, 466 A.2d 1328 (1983) (McDermott, J., concurring). However, ordinarily we require that a jury's verdict of guilty be rationally based in the evidence. *See Commonwealth v. Moore,* 463 Pa. 317, 325–29 & n. 7, 344 A.2d 850, 855–56 & n. 7 (1975) (Roberts, J., concurring). Here there simply is no reason to suppose that the jury might have found appellant guilty of felony-murder. Besides the fact that the evidence unequivocally proved premeditated murder, the inherent, arbitrary powers of a jury to find a lesser crime or exercise mercy simply were not in play, since premeditated murder and felony-murder at the time were both first-degree and carried identical penalties. *Compare, e.g., Commonwealth v. Hoffman,* 439 Pa. 348, 266 A.2d 726 (1970) (power of jury to return voluntary manslaughter verdict on murder indictment).

I am not attempting in the least to arrogate the jury's prerogative to "weigh the evidence." I am stating the plain and commonsensical fact that there is not the slightest possibility the jury relied exclusively on a felony-murder theory in reaching its verdict. The majority, by saying the jury might have relied on the theory anyway, is importing unwarranted irrationality to a facially sound verdict. I disagree with the majority because its application of a constitutional rule of law turns on an irrational possibility it has manufactured. I do not, as the majority suggests, shrink from my judicial responsibility to apply the rule in *Tarver,* as my opinions applying the rule attest. *Commonwealth v. Maddox,* 307 Pa.Super. 524, 453 A.2d 1010 (1982); *Commonwealth v. Fortune,* 305 Pa.Super. 441, 451 A.2d 729 (1982).

afforded to prisoners whose cases were on direct appeal when *Tarver* came down, *Commonwealth v. Starks,* 304 Pa.Super. 527, 450 A.2d 1363 (1982), such relief heretofore has not been applied retroactively beyond the *Tarver* case itself. My reading of recent Supreme Court pronouncements on the retroactive effect of decisions changing prior law convinces me that the *Tarver* rule should not apply to judgments of sentence final at the time of the *Tarver* decision (as Gillespie's was). *See Commonwealth v. Cabeza,* 503 Pa. 228, 469 A.2d 146 (1983) (opinion by Larsen, J.; dissenting opinion by Nix, J.); *Commonwealth v. Geschwendt,* 500 Pa. 120, 454 A.2d 991 (1982) (plurality opinion by Nix, J.); *Commonwealth v. Brown,* 494 Pa. 380, 431 A.2d 905 (1981). *See also United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982); *Desist v. United States,* 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *cf. Robinson v. Neil,* 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973) (double jeopardy rule given full retrospective application where prior constitutional decision did not depart from prevailing law, so that convictions obtained in violation of decision were void ab initio).

Chief Justice Bell, dissenting in *Commonwealth ex rel. Smith v. Myers, supra,* quoted Justice Cardozo from *The Nature of the Judicial Process,* 66–67: "When they [judges] are called upon to say how far existing rules are to be extended or restricted, *they must let the welfare of society fix the path, its direction and its distance ... The final cause of law is the welfare of society ...*" 438 Pa. at 248, 261 A.2d at 565. I can conceive of no way in which the welfare of society might be served by today's extension of the *Tarver* rule. Under the 1939 Crimes Code the degrees and penalties for intentional murder and felony-murder were identical, so there rarely was any reason for a jury deciding to convict a defendant on combined murder-felony counts to specify whether the defendant acted with intent to kill. Now all defendants convicted by means of such unspecific verdicts are ipso facto felony-murderers, regardless

whether the jury would have labelled them intentional killers had they foreseen the legal loophole now available. Scores of premeditated murderers can now expect to walk through the loophole to have their consecutive felony sentences expunged in Post Conviction Hearing Act proceedings.

Of course, all these murderers are left, along with appellant, serving mandatory life sentences. But their newfound blanket categorization as felony-murderers is not a distinction without a difference. It is well known among sentencing judges that one reason for adding a consecutive felony sentence to a life sentence is to increase the time served by a defendant before he comes up for parole. *See Commonwealth v. McClendon*, 495 Pa. 467 n. 3, 434 A.2d 1185 n. 3 (1981) (dissenting opinion by Roberts, J., and cases there cited). I take it on eminent, albeit second-hand, authority that " 'As the Court well knows a life sentence in Pennsylvania at the present time carries an average sentence in the neighborhood of fifteen years.' " Spaeth, J., dissenting in *Commonwealth v. Burno*, 310 Pa.Super. 564, 568, 456 A.2d 1080, 1081–82 (1983) (quoting an unnamed assistant district attorney). I am troubled by the prospect that the enormity of acts like Mr. Gillespie's might be forgotten in the passage of time, and that today's decision could help such a cold-hearted young man and others similarly situated to reach the street after many hard-bitten years in the state penitentiary, but sooner than their sentences intended.[2]

**2.** In belittling our reliance on the wisdom of an unnamed assistant district attorney, the majority also slights an important point: that nobody really knows how much time a defendant sentenced to life imprisonment will have to serve. It is probably common knowledge that a sentence of life imprisonment does not necessarily spell life in prison for the defendant; certainly it is common for juries in murder cases to inquire about the actual length of a life term. *See Commonwealth v. Johnson*, 368 Pa. 139, 81 A.2d 569 (1951); *see also Commonwealth v. Rogozinski*, 387 Pa. 399, 128 A.2d 28 (1956); *Commonwealth v. Ballem*, 386 Pa. 20, 123 A.2d 728 (1956); *Commonwealth v. Bibalo*, 375 Pa. 257, 100 A.2d 45 (1953); *cf. Commonwealth v. Chapasco*, 436 Pa. 143, 258 A.2d 638 (1969) (jury recommended parole not be considered); *Commonwealth v. Celijewski*, 324 Pa.Super. 185, 471 A.2d 525 (1984) (semble). Despite the concern jurors often display about what will happen if they sentence someone to life, it is improp-

er for trial judges or district attorneys to discuss with them the possibilities of commutation and parole. *Commonwealth v. Aljoe,* 420 Pa. 198, 216 A.2d 50 (1966); *Commonwealth v. Mills,* 350 Pa. 478, 39 A.2d 572 (1944). *See generally* Annot., 16 A.L.R.3d 1137 (1967).

Given the general confusion about the meaning of a life term, some Pennsylvanians might be surprised to learn that there are no statutory guidelines governing decisions to parole life prisoners. The answer to the question "How much time will a lifer serve?" falls somewhere in the gray area among the bailiwicks of various policy-making officials in the administrative branch of government. In the first instance, before a life prisoner may be paroled the Governor must commute his minimum sentence to a term of years. This the Governor may do only on the recommendation of the Board of Pardons. Pa. Const. art. 4, § 9; The Administrative Code of 1929, § 909, *as amended by* Act of July 31, 1968, P.L. 769, No. 240, art. VI, § 609(8), 71 P.S. § 299. Next, after expiration of the term of years as commuted, the Board of Parole must exercise its discretion whether to parole the prisoner, subject, however, to the authority of the Board of Pardons to order parole if the Board of Parole does not. Act of Aug. 6, 1941, P.L. 861, § 21, *as amended,* 61 P.S. § 331.21. Of course, in deciding whether to grant parole the Parole Board must consider any recommendations made by the judge who heard the case and who may even have imposed the original sentence. But the final decision on how much time a life prisoner will serve remains purely an administrative matter.

Although my statistics are not completely up to date, they indicate that parole is a looming possibility for a life prisoner. For the years 1967–1980, the Board of Pardons heard 1251 applications by life prisoners for commutations of sentence, and in 379 (30%) of these cases recommended to the Governor that sentence be commuted. Analyses of the Action of the Board of Pardons Sessions for the Calendar Years 1967–1980. And according to tables prepared for the Parole Board, over the years 1962–1971 inclusive 180 life prisoners were released after having served an average of 19 years, 7 months in prison; for the years 1971–1980 inclusive 219 were released after an average of 17.7 years served. (Figures for the year 1971 are different in the two tables I have access to, "Lifers Released on Parole During the Past Ten Years [1962–1971]," and "Time Served by Commuted Lifers 1971 to 1980").

Of course, averages are only averages, and who is to say what they will mean when the Governor and Boards of Pardon and Parole come to assess Mr. Gillespie's case? Maybe our unnamed assistant district attorney's estimate "in the neighborhood of fifteen years" will prove inaccurate, and Gillespie will stay in jail much longer than that. On the other hand, there have been quite a few life prisoners who have won their freedom well before serving fifteen years. *See, e.g.,* Pennsylvania Board of Parole, A Report of Special Commutation Cases, Table 3 (of 29 first-degree murderers released during period 12/7/52–6/21/54, 23 had served less than 15 years; of these, 7 had served less

than 10 years). Whatever eventually happens in Mr. Gillespie's case, he moves one step closer to the prospect of release with his victory in Court today.