J-A18005-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALLEN WADE | : | |
| | : | |
| Appellant | : | No. 1669 WDA 2016 |

Appeal from the Judgment of Sentence May 26, 2016
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0004799-2014

BEFORE: BOWES, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.: **FILED NOVEMBER 27, 2019**

Allen Wade appeals from the judgment of sentence of two consecutive life-without-the-possibility-of-parole sentences imposed following his conviction of two counts of murder in the first degree and related charges. We affirm.

The trial court provided a thorough summary of the facts underlying this appeal:

> In February 2014, sisters Sarah and Susan Wolfe resided together at 701 Chislett Street in the East Liberty section of the City of Pittsburgh. Appellant resided next door at 703 Chislett Street with his girlfriend, LaShawn Rue.
>
> On February 7, 2014, at approximately 1:00 P.M., Matthew Buchholz, Sarah's boyfriend, received a Facebook message from Garrett Sparks, a physician who worked with Sarah at UPMC. Sparks asked Buchholz to check on Sarah because she was late for work that morning and nobody had heard from her. At approximately the same time, Pittsburgh Police Officer Frank Walker received a "well check" request for Susan from her co-

worker because Susan also had not yet arrived at work that morning.

Buchholz immediately drove to the Wolfe residence, and knocked on the door but did not receive a response. Officer Walker arrived shortly thereafter and spoke with Buchholz. Buchholz and Officer Walker surveyed the perimeter of the home and noticed that Sarah's vehicle, a lime green Ford Fiesta, was not parked on the street. Buchholz left to retrieve a spare key to the Wolfe residence from his nearby residence and returned within ten minutes to open the door for Officer Walker.

Officer Walker and Buchholz entered the residence together. The alarm had been disarmed, and the two proceeded further into the residence to look for Sarah and Susan. Buchholz called out for Sarah, but there was no response. He noticed that the basement door, which was usually only cracked open, was wide open. He looked through the doorway and observed a pair of bare legs on the floor of the basement. He immediately pulled back and called for Officer Walker. Buchholz then noticed that the entryway table was broken, and that blood, which was later matched to Susan, was spattered on the walls in the entryway. He ran outside onto the porch and collapsed. He remained seated on the porch until he was taken to police headquarters for questioning.

Officer Walker proceeded to the basement door. He looked down into the basement and observed Susan face down, nude, with an apparent gunshot wound to the back of her head. A short distance away, he observed Sarah with a blanket over her face and blood coming out from underneath the blanket and her left arm was "up in the air." Officer Walker called for a medic, backup officers, supervisors, and ordered Buchholz to remain on the porch. Backup officers arrived and secured the scene. Several homicide detectives, the mobile crime unit, and the medical examiner arrived shortly thereafter and began processing the scene.

Susan was lying face-down in the basement, nude, on top of a pile of clothing, and was pronounced dead on scene. Upon autopsy the cause of death was determined to be a penetrating gunshot wound to the head. Susan suffered skull fractures and hemorrhages as a result of the gunshot wound. Susan also suffered blunt force trauma to the head, multiple lacerations of the skull, and seven full thickness lacerations (a laceration where

the bone is exposed) to the back hemisphere of her head. The full thickness lacerations indicated that she was struck with a hard blunt instrument. She additionally suffered blunt force trauma to the trunk, and abrasive injuries and faint contusions on her back and chest, as well as abraded contusions on her face. There was vomit on the ground beneath her face, and feces exiting her rectum. Toilet paper was attached to the feces. The presence of vomit indicated that she was alive at some point while she was in the basement. A spent .38/.357 bullet was recovered from between the two cerebral hemispheres near the front of the brain during her autopsy. The bullet was damaged, but the crime lab was able to identify its rifling characteristics as six lands and grooves and a right hand twist.

Sarah also was lying on the floor of the basement, with a comforter over her head, and she was also pronounced dead on scene. Upon autopsy the cause of death was determined to be a penetrating gunshot wound to the head. Sarah suffered multiple contusions and abrasions on the face and neck due to some form of blunt force trauma. She also suffered numerous contusions and abrasion on all four extremities, consistent with being dragged down the basement steps. Sarah's clothes exhibited bleach marks and a purple sticky, slippery liquid was found on her purse and her pants. The basement smelled of bleach, and there was fabric softener/detergent, consistent with the liquid on the purse, on the steps heading to the basement. During autopsy, a spent .38/.357 caliber bullet was recovered from inside her right eye socket. The bullet was heavily damaged, but had a rifling classification of six lands and grooves with a right hand twist, and could have been discharged from the same firearm that discharged the bullet recovered during Susan's autopsy.

No car keys, cell phones, or bank cards were found near the sisters or in Susan's purse which was found near the bodies. A search warrant was obtained for the bank records of the two sisters. The search revealed that an individual attempted to use both of their debit cards at the East Liberty Citizens' Bank branch ATM early that morning. Specifically, the following transactions were attempted or completed: (1) at 12:44 A.M. a withdrawal was denied using Sarah's card; (2) at 12:45 A.M. a withdrawal was denied using Sarah's card; (3) at 12:46 A.M. a withdrawal was successfully made using Sarah's card; (4) at 12:52 A.M., a withdrawal was denied using Sarah's card; and (5) at 12:53 A.M. a withdrawal was denied using Susan's card.

A "BOLO" was issued for Sarah's Ford Fiesta, and in the early morning hours of February 8th the vehicle was located in the business district of East Liberty on South Witfield Street. This location was approximately three blocks from the ATM machine where the withdrawals were attempted or completed. The vehicle was secured and subsequently towed for processing.

Uniformed Police Officer Gregory McGee started his shift on February 8, 2014, at 7:00 a.m. Officer McGee, after finishing up some initial calls, went to Whitfield Street where the Wolfe vehicle was found. Officer McGee walked on Whitfield Street away from that area toward Station Street and soon discovered what he described as a "pattern" of discarded clothing, including a winter black knit hat and a pair of grey sweatpants. The black knit hat was laying just off the sidewalk on top of snow and leaves in a pile of mulch. The sweatpants were discovered approximately sixty feet ahead and were "arranged" on the sidewalk, as if the person who had worn them had been standing up and just pulled their pants down and stepped out of them like a "fireman's pants." The sweatpants looked as though they had not been disturbed and had been there for only a short period of time. Officer McGee also observed a University of Pittsburgh Medical Center (UPMC) business card approximately one foot away from the sweatpants. The card was that of Cameron Mager, who was a social worker at UPMC. The number "4991" was handwritten on the back. Officer McGee advised his supervisor as to what he had found and was directed to call the homicide detectives who met him at the scene shortly thereafter. After the detectives arrived, Officer McGee continued to canvass the area and observed some black knit items, later identified as a balled up pair of socks, in a garbage can in the rear of the Midas Muffler Shop further on Whitfield Street.

The mobile crime unit arrived, documented and collected the items discovered on Whitfield Street: the sweatpants, the business card, the knit hat, and the socks found in the garbage can outside the Midas Muffler Shop. All items were submitted to the crime lab for testing. Additionally, the vehicle was inventoried after being towed, and several items were tested for DNA and/or fingerprints. In total, over 100 items of evidence were collected form the Wolfe residence, Sarah's vehicle, Whitfield Street, and the bodies of Susan and Sarah Wolfe. All of the items were submitted for forensic testing.

The items from Whitfield Street were submitted for DNA testing.[9] The crime lab found that: (1) the waistband of the sweatpants contained a mixture of at least three persons, of which Appellant and Rue, Appellant's girlfriend, could not be excluded as possible contributors; (2) a possible bloodstain on the sweatpants contained a mixture of two individuals, with Appellant as the major contributor; and, (3) the sock contained a mixture of at least three persons, from which Appellant could not be excluded. The probability of selecting another person in the African-American population with the same DNA profile as Appellant is 1 in 3.95 quintillion.

---

[9] Appellant had provided a DNA sample at an earlier date, on an unrelated case, and his DNA profile was stored in the CODIS System.

---

During the autopsy, red/brown staining was found on the leading edge of three of Susan's right hand fingernails. These were clipped and submitted to the Allegheny County Crime Lab. The crime lab determined that the fingernails contained a mixture of at least three individuals, and that Appellant, Rue, and Susan could not be excluded. Due to restrictions in the county crime lab math models regarding determining major and minor contributors in mixtures of this small size, the crime lab sent the data to Dr. Mark Perlin of Cybergenetics for additional testing using probabilistic genotyping (TrueAllele). Using TrueAllele, it was determined that the DNA found on Susan's fingernails matched Appellant, and that it was 6.06 trillion times more probable than a coincidental match to an unrelated African American individual.

The UPMC business card found on Whitfield Street next to the sweatpants was identified by Cameron Mager as a business card that he gave to his clients in his capacity as a social worker at UPMC. He provided one such card to Susan Wolfe on an initial meeting in September 2013. He never met with Appellant. The number "4991" found on the back of the business card was not written by Mager or the crime lab. The number "4991" was the last four digits of the Wolfes' childhood family telephone number in the state of Iowa where the sisters grew up and their parents still lived.

Police canvassed the East Liberty area for surveillance videos to tract the whereabouts of the individual who had abandoned Sarah's vehicle and the person who had attempted to use the sisters' debit cards. They sought videos from several area businesses, and recovered videos from Citizen Bank, Target, Carnegie Library, Monet Capital at Walnut and Highland, Midas Muffler Shop, and the Sunoco Gas/Convenience Store at East Liberty Boulevard and Highland Avenue.

A compilation of the videos was played at trial, which spanned the timeframe of February 7, 2014 at 12:32 a.m. to approximately 1:12 a.m., [and] showed Appellant dressed in a red jacket, grey sweatpants, and white shoes. The videos further established that Appellant drove Sarah's Lime Green Ford Fiesta past the Carnegie Library around 12:32 a.m. and parked the vehicle on Whitfield Street. He exited Sarah's vehicle and walked toward Centre Avenue. Appellant then walked through the East Liberty area, made a left onto Penn Avenue, and walked past a Citizen's Bank ATM and Target Store. Appellant then crossed Penn Avenue toward Centre Avenue and made a left onto Kirkwood Street. Minutes later he crossed back over Penn Avenue and walked toward the area he had originally come from eventually stopping at the Citizens' Bank where he attempted to make a withdrawal from the ATM there. While at the ATM, he held two PNC Bank ATM cards in front of the ATM camera and attempted to cover his face with the light-colored shirt he was wearing. At the ATM he used the sisters' PNC Bank ATM cards ultimately getting $600 from the machine using Sarah's ATM card. After successfully making the ATM withdrawal, Appellant walked across Penn Circle toward Whitfield Street near where he had parked Sarah's vehicle earlier. Appellant thereafter discarded the grey sweatpants he was wearing outside of the Midas Muffler Shop on Whitefield Street and continued walking toward Highland Avenue.

Additionally, Appellant was observed in one of the videos emptying his pockets and throwing something into the trash can at the front entrance of the Sunoco store on Highland Avenue before entering. The police conducted a garbage pull on the dumpsters at the Sunoco store on February 13, 2014, and located six bags there were from the outside of the Sunoco store. In one of the bags, they found an "Iowa Prison Industries" pen. Iowa Prison Industries does not conduct business in Pittsburgh. Susan and Sarah's sister, Mary Wolfe, who was an elected member of the Iowa General Assembly, worked with Iowa Prison Industries.

As part of this relationship, Mary received pens from Iowa Prison Industries during facility tours that she would keep at her home office in Iowa. Prior to moving to Pittsburgh, Susan worked in the reception area of her sister's home office and often used those pens.

Still photographs of Appellant were created from the Sunoco video and distributed to uniform and patrol officers. On February 19, 2014, Pittsburgh Police Officer Wade Sarver was on patrol in the area, attempting to locate the individual from the Sunoco store video. He observed fellow Officer John Svitek talking to Appellant on his porch at 703 Chislett Street, and immediately recognized Appellant as the individual in the Sunoco video. Officer Svitek concluded his brief conversation with Appellant, left Appellant's porch, and spoke with Sarver in the street. Officer Svitek had been in the area talking to the Appellant because he believed he fit the description of the actor based upon a picture he had been given earlier in the investigation by Zone Five command staff. The two officers conferred about their perception that Appellant matched the actor in the Sunoco video, and they returned to 703 Chislett to maintain contact with Appellant as well as contact their superior and homicide detectives. Appellant answered the door and invited the officers inside. Sarver contacted the homicide office to actually conduct an interview with Appellant, and he waited with Appellant until they arrived, approximately fifteen minutes later.

Homicide Detectives interviewed Appellant at his home and showed him the Sunoco still photo. Upon viewing the photo, Appellant replied, "that sure looks like me." Appellant was subsequently transported to the homicide office and formally interviewed there. When asked if he had ever been inside 701 Chislett Street, Appellant told detectives that he had never been in that residence. Without any mention of DNA or semen, Appellant gratuitously remarked that they would never find his DNA or semen inside the house. Appellant also told the detectives that he previously owned a .380 caliber firearm, but he had since sold it.

In investigating Appellant's statement that he had never been in the Wolfe residence before, the detectives discovered that Susan and Sarah had been the victims of a burglary on December 30, 2013, wherein two televisions and two cable boxes were stolen. In that incident the means of entry was toward the back

of the house, on the same side as Appellant's residence, through a small ground level window that had been pried out, a maneuver that would have taken a lot of time and tools. The sisters had reported the burglary to authorities, and the police advised the sisters to get a security system. The following day, Officer Yolanda Roberts visited the home and collected a knit hat from the kitchen counter, which the sisters told police did not belong to them. The hat had not been subject to further testing at that juncture but was retained in the police evidence room.

That knit hat was submitted to the crime lab for DNA testing as part of the homicide investigation. The crime lab determined that Sarah and Susan were excluded, but could not draw any conclusions regarding Appellant's DNA profile. The crime lab recommended that the data be sent to Dr. Perlin for probabilistic genotyping. Using TrueAllele, it was determined that Susan and Sarah were excluded, and Appellant's DNA matched the DNA found on the hat, with a finding that it was 65.3 thousand times more probable than a coincidence.

Trial Court Opinion, 5/9/18, at 9-21 (citations and footnotes omitted).

Appellant was arrested and charged with three counts of theft by unlawful taking, two counts each of criminal homicide and robbery, and one count each of burglary, access device fraud, and person not to possess a firearm. The Commonwealth served notice of its intention to seek the death penalty and filed a notice of its intention to present Pa.R.E. 404(b) evidence. Specifically, the Commonwealth sought introduction of evidence that the victims' home had been burglarized five weeks before the murders, and that a knit hat recovered during the investigation of that incident contained DNA that matched Appellant's profile. Following a hearing, the trial court granted the motion. Additionally, the court granted a defense motion to sever the person not to possess a firearm charge.

On May 2, 2016, Appellant proceeded to a jury trial on all remaining charges. Prior to the close of trial, all three of the receiving stolen property charges were withdrawn. On May 23, 2016, Appellant was found guilty of two counts of first-degree murder and all remaining charges. After the jury hopelessly deadlocked on the death penalty, the trial court imposed a sentence of life without the possibility of parole for each murder conviction and consecutive ten-to-twenty year terms of imprisonment for each robbery and burglary conviction. Appellant timely filed a post-sentence motion, which was denied. Appellant timely appealed, and both Appellant and the trial court complied with the mandates of Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

I. Did the trial court abuse its discretion when permitting the Commonwealth to introduce evidence of a hat that had been found at the victims' home subsequent to a burglary over a month prior to the instant offenses in that the evidence was not relevant, more prejudicial than probative, and inadmissible under both the propensity evidence exception and the hearsay rule?

II. Did the trial court abuse its discretion when it permitted evidence prejudicial to the defense (specifically, PowerPoint slides used by Dr. Lorenz during his expert testimony regarding DNA testing and analysis) to go out with the jury during its deliberations?

III. Did the trial court abuse its discretion when it failed to grant a mistrial after the Commonwealth elicited testimony from a witness, Matthew Buchholz, about a polygraph examination related to the double murder?

Appellant's brief at 9.

- 9 -

In his first claim, Appellant argues that the trial court erred when it admitted a black knit hat recovered after the December 2013 burglary of the victims' residence, since it was (1) irrelevant, (2) more prejudicial than probative, and (3) inadmissible hearsay. *Id*. at 20. We consider Appellant's challenge to the admission of the hat mindful of our standard of review:

> The admissibility of evidence is a matter addressed to the sound discretion of the trial court and . . . an appellate court may only reverse upon a showing that the trial court abused its discretion. As abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice manifest unreasonableness, or misapplication of law.

*Commonwealth v. Cox*, 115 A.3d 333, 336 (Pa.Super. 2015) (internal citations and quotation marks omitted). Additionally, we note that we may affirm the trial court's ruling on any basis supported by the record. *Commonwealth v. Johnson*, 160 A.3d 127, 144 (Pa. 2017).

By way of background, the victims reported a burglary at their home on December 30, 2013, five weeks before they were murdered. N.T. Jury Trial – Volume III, 5/9/16, at 1197. On that occasion, there were signs of forced entry through a low bathroom window in the side of the house and two televisions and cable boxes were missing. *Id*. at 1198. On December 31, 2013, a member of the mobile crime unit responded to the victims' home in order to photograph and gather evidence. *Id*. at 1210. While the officer was in the residence, Susan pointed out a hat on the kitchen counter that did not belong to anyone in the home. *Id*. at 1215. The officer recovered the hat and placed it into an evidence locker. *Id*.

- 10 -

Two weeks after the murders, a detective interviewed Appellant and twice asked him if he had ever been inside the victims' home, either while they lived there or before. N.T. Jury Trial – Volume Five, 5/13/16, at 2034, 2036. Both times, Appellant denied having ever been inside the home. *Id*. Additionally, he volunteered that the police would never find his DNA or semen inside the house. *Id*. at 2036. However, at trial, Dr. Mark Perlin testified that a comparison through probabilistic genotyping showed a DNA match between the hat recovered during the burglary and Appellant was 65.3 thousand times more probable than coincidence. N.T. Jury Trial – Volume Four, 5/12/16, at 1804-05. Notably, the victims were excluded as contributors to the hat.

First, Appellant alleges that the hat was not relevant. Relevant evidence is admissible if it "tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference regarding a material fact." *Commonwealth v. Tyson*, 119 A.3d 353, 358 (Pa.Super. 2015) citing to *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. 2002). The trial court found that the evidence was relevant, since it tended to establish that Appellant had been inside the sisters' residence previously. Trial Court Opinion, 5/9/18, at 24. We agree. The existence of this evidence, placing Appellant inside the victims' house, directly contradicted Appellant's two statements to police. Thus, the record supports the trial court's conclusion that the hat was relevant.

Next, Appellant attacks the admission of the hat, and testimony surrounding its admission, as improper propensity evidence. He contends that it connected him to a prior burglary although it failed to show that he was in the victims' home, since the hat could have been brought inside the home by one of the sisters. Appellant's brief at 27.

> Under Pa.R.E. 404(b):
>
> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.
>
> (2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
>
> (3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Notably, if evidence is being offered under one of the exceptions, it is only admissible if the probative value outweighs the danger of unfair prejudice to the defendant. Pa.R.E. 404(b)(3).

By introducing the hat into evidence, the Commonwealth connected Appellant to the prior burglary at the victims' residence. When reviewed in light of Pa.R.E. 404(b), this evidence presented by the Commonwealth constituted evidence of other crimes committed by Appellant. However, the Commonwealth posits that the evidence falls within a rebuttal exception, recognized by our Supreme Court in **Commonwealth v. Saxton**, 532 A.2d

352, 357 (Pa. 1987), and reiterated by us in **Commonwealth v. Matthews**, 783 A.2d 338, 341 (Pa.Super. 2001), which rendered evidence of this type admissible for a limited purpose. Commonwealth's brief at 33. We agree.

Under the precedent established by these cases, the Commonwealth may introduce evidence of a defendant's prior crime in order to rebut statements made by a defendant which created improper or false inferences favorable to him. **Matthews**, **supra** at 341. That is precisely what happened here. Appellant's DNA, present on an article of clothing found inside the residence six weeks prior to the murders, rebutted Appellant's self-serving statements that he had never been in the home, falling squarely within this well-established exception.

Further, Appellant has failed to persuade us that the probative value was outweighed by the evidence's prejudicial impact. The Commonwealth limited its usage of the evidence to permissible grounds: to show that Appellant had been in the house before. Further, despite three offers by the trial court to provide a cautionary instruction, Appellant repeatedly declined the court's offer. N.T. Jury Trial - Volume One, 5/3/16, at 405; N.T. Jury Trial – Volume Three, 5/9/16, at 1218; N.T. Jury Trial – Volume Six, 5/18/16, at 2348. Accordingly, we discern no basis to disturb the trial court's overruling of Appellant's objection to the admission of the hat and all testimony surrounding it into evidence on this basis.

Finally, Appellant attacks the admission of Susan's identification of the hat as not belonging to her or her sister, as inadmissible hearsay that does not fit an enumerated exception. Appellant's brief at 36. The trial court and the Commonwealth respond that this statement does not constitute hearsay because it was not admitted to prove Appellant committed a burglary, but to explain the detective's course of conduct. Trial Court Opinion, 5/9/18, at 25; Commonwealth's brief at 45. Specifically, the statement was offered to show why the detective collected the hat as part of her investigation into the commission of the burglary. *Id*. We agree.

Hearsay is "an out of court statement offered for the truth of the matter asserted and is inadmissible unless it falls within an exception to the hearsay rule." ***Commonwealth v. Manivannan***, 186 A.3d 472, 480 (Pa.Super. 2018); Pa.R.E. 801(c). However, it is well-established that an out-of-court statement offered, not for its truth, but to explain the witness's course of conduct, is not hearsay. ***Commonwealth v. Johnson***, 42 A.3d 1017, 1035 (Pa. 2012).

Appellant relies on ***Commonwealth v. Dent***, 837 A.2d 571 (Pa.Super. 2003), to argue that, despite the long standing precedent that course of conduct testimony is not hearsay, the statement was still hearsay as admitted because it was introduced under the pretext of the course of the detective's investigation in order to connect him to the burglary. We disagree.

In **Dent**, the sole issue was the identity of a shoplifter. The appellant maintained that she was not in the store at the relevant time. The Commonwealth introduced the testimony of an officer who identified Appellant from surveillance footage. In an attempt to strengthen the weak identification evidence, the Commonwealth sought to utilize an identification made by appellant's sister on-scene to that same police officer, as course of conduct evidence. We found that since the officer had not seen Appellant and the surveillance footage was unavailable at trial, the entire case hinged upon the sister's identification. We expressed concern that the identification evidence had been presented in the form of an "oblique narrative" relating to the course of police investigations, and concluded that this aspect of the officer's testimony was inadmissible hearsay that should have been excluded. **Id**. at 580.

However, **Dent** is factually distinguishable. Susan's statement did not identify Appellant as the owner of the hat, nor did the detective's testimony prove that Appellant had been in the house at the time of the burglary. Here, the statement was plainly not an "oblique narrative", since it was used solely to explain the reason why the detective collected the hat. This was pure course of conduct testimony. Accordingly, we find that the trial court did not err when it found that the detective's statement did not constitute hearsay on this basis.

Appellant's second issue is an attack on the trial court's decision to allow the jury to have access during deliberations to Dr. Lorenz's PowerPoint slides. Appellant's brief at 49-51. The decision as to whether an exhibit should be allowed to go out with the jury during deliberations is within the sound discretion of the trial judge, and such choice will not be overturned absent an abuse of discretion. ***Commonwealth v. Dupre***, 866 A.2d 1089, 1102 (Pa.Super. 2005); Pa.R.Crim.P. 646(A). Specifically, Pa.R.Crim.P. 646 provides as follows:

> (A) Upon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in the paragraph (B).
>
> (B) During deliberations, the jury shall not be permitted to have:
>
> > (1) a transcript of any trial testimony;
> >
> > (2) a copy of any written or otherwise recorded confession by the defendant;
> >
> > (3) a copy of the information;
> >
> > (4) written jury instructions.
>
> (C) The jurors shall be permitted to have their notes for use during deliberations.

Pa.R.Crim.P. 646.

At trial the PowerPoint exhibits were admitted, in conjunction with Dr. Lorenz's testimony, by motion of the Commonwealth. N.T. Jury Trial – Volume Three, 5/10/16, at 1408, 1509-10; N.T. Jury Trial – Volume Four, 5/12/16, at 1719. The PowerPoint was not initially sent out with the jury for deliberations. However, once the jurors asked for the entire PowerPoint presentation, the

"case specific" portions of it were provided, after an extensive review of the slides and over multiple defense objections. N.T. Jury Trial – Volume Six, 5/20/16, at 2617-56. Importantly, the trial court found that providing the PowerPoint slides to the jury was not precluded by the Pennsylvania Rules of Criminal Procedure or appellate precedent, as the slides did not equate to transcripts of trial testimony. *Id*. Additionally, the court determined that any potential prejudice to Appellant could be cured by a cautionary instruction. Accordingly, before giving the jury the slides, the court instructed the jurors not to place undue emphasis on the content of the slides, but to review them in the context of Dr. Lorenz's entire testimony. *Id*. at 2656.

Appellant concedes that the PowerPoint presentation was admitted into evidence as a Commonwealth exhibit and that exhibits are generally permitted to be given to the jury during their deliberations. Appellant's brief at 51. However, he maintains that the trial court's inclusion of the PowerPoint slides was the functional equivalent of giving the jury a transcript of Dr. Lorenz's trial testimony, absent the cross-examination. Thus, he contends that they should have been prohibited under Pa.R.Crim.P. 646(C)(1). *Id*. at 57-60. We disagree.

Our Supreme Court has explicitly held that the term "transcript" in Rule 646(C) refers only to a written transcript of testimony. ***Commonwealth v. Williams***, 9 A.3d 613, 623 (Pa. 2010) (finding that the jury's review of audio-recorded trial testimony during its deliberations did not constitute a

"transcript" that would be prohibited under Rule 646(C), since it was not a "written, typed or printed copy of testimony orally."). Perhaps most akin to our case, in *Commonwealth v. Woodard*, 129 A.3d 480, 497 (Pa. 2015), our Supreme Court found that the trial court did not abuse its discretion when it allowed the jury to review expert medical reports during its deliberations. The Court explained that medical reports are not "specifically precluded from examination during deliberations pursuant to Rule 646(C)." *Id*. Further, no prejudice arose from the jury's review of these materials because both expert reports from the defense and the prosecution were included. *Id*.

Viewed plainly, the trial court found that the PowerPoint slides were not the functional equivalent of "a written reproduction of a witness's testimony as a transcript." *Williams*, *supra* at 623. Trial Court Opinion, 5/9/18, at 30. A review of the certified record and relevant legal precedent supports the trial court's conclusion. It was well within the trial court's discretion to grant the jury's request to review these slides as an aid to assist them in unpacking complex DNA evidence testimony that went on for many hours. Further, just as in *Woodard*, the trial court guarded against any potential prejudice when it delivered a cautionary instruction. *See Commonwealth v. Aiken*, 168 A.3d 137, 143 (Pa. 2017) (reiterating the long-held presumption that jurors follow trial court instructions). Accordingly, no relief is due.

In his final issue, Appellant argues that the trial court abused its discretion when it failed to grant a mistrial after the Commonwealth elicited

testimony from Matthew Buchholz about a polygraph examination. Appellant's brief at 64-76. A motion for a mistrial is within the discretion of the trial court. *Commonwealth v. Tejeda*, 834 A.2d 619, 623 (Pa.Super. 2003). A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. *Id*. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. *Id*. On appeal, our standard of review is whether the trial court abused that discretion.

By way of background, after a pre-trial oral motion *in limine* by the defense, both sides agreed to avoid mentioning the fact that Buchholz had taken a polygraph examination at trial. Buchholz was the first witness called by the Commonwealth. He explained his actions and interactions throughout the morning of February 7, 2014, up until the point that he discovered the victims' bodies in their basement. The questioning proceeded chronologically, focusing next on Buchholz's interactions with the police. The following exchange occurred:

> Q. Without asking any specific questions as to what was done at the police station, did you meet with them? Did you speak with them?
>
> A. Yes, I talked to an officer for – I was there for several hours. I talked to a couple of different officers. They asked me to take a polygraph test, which I did. I was there for several hours talking with them.

N.T. Jury Trial – Volume One, 5/2/16, at 117-18. The parties immediately approached sidebar and defense counsel requested a mistrial. *Id*. at 118.

The prosecutor represented that he had "deliberately [tried] to steer clear of [any mention of polygraph testing]." *Id*. at 119. The trial court agreed that there had been no deliberate attempt by the prosecutor to solicit the improper reference and refused to declare a mistrial. Trial counsel declined the court's offer to instruct the jury to disregard this information, reasoning that to do so would only draw more attention to the inappropriate testimony. *Id*.

During a short recess, defense counsel advised the court that she had spoken with Buchholz, and he had informed her that the Commonwealth had not instructed him to refrain from any mention of the lie detector test. The prosecutor responded that he had indeed spoken with Buchholz, but that he had done so many months before during a pretrial interview. *Id*. at 153. The trial court found "that in the pressures attached to testifying and preparation this was not an intentional conduct on behalf of the prosecutor or the witness." *Id*. at 154.

The next day, defense counsel presented the court with a curative instruction that she had prepared. N.T. Jury Trial – Volume One, 5/3/16, at 286-87. At the close of testimony on the second day, the court delivered the instruction as follows:

> Yesterday you heard the testimony from Mr. Buchholz that he took a lie detector test at or during the time of his interview

with the Pittsburgh Police homicide detectives. It is recognized that these tests and the results lack any established scientific reliability, and they are deemed inadmissible in any court proceeding because of their inherent [un]reliability. And that is the law of the United States and this Commonwealth.

You are entirely to disregard Mr. Buchholz's testimony and references in that regard, and you may not draw any inferences from that part of his testimony. Thus, you may not consider any evidence regarding the test.

Determining the weight and credibility of Mr. Buchholz and any witness is your function to be completed consistent with the instructions that I have given you and I will give you at the conclusion of this case.

*Id*. at 498-99. The trial court also instructed the jury how to evaluate witness credibility in both its opening remarks and final charge. N.T. Jury Trial – Volume One, 5/2/16, at 17; N.T. Jury Trial – Volume Six, 5/18/16, at 2526-27.

In determining whether a reference to a polygraph test warrants a mistrial, our Supreme Court has provided three factors that guide our analysis: "(1) whether the Commonwealth prompted the reference to the polygraph test; (2) whether the reference suggested the results of the polygraph; and (3) whether the trial court issued prompt and adequate instructions regarding the unreliability and inadmissibility of polygraph tests. ***Commonwealth v. Fortenbaugh***, 69 A.3d 191, 193 (Pa. 2013). Next, we assess the resulting prejudice, considering "whether such reference, considered in the light of the circumstances of the case, cause[d] an inference to arise as to the defendant's guilt or innocence." ***Id***.

Appellant acknowledges that the prosecutor's question did not specifically refer to a polygraph test, but nonetheless alleges that the prosecutor deliberately solicited this testimony anyway through his own negligence. Appellant's brief at 69-70. Further, he argues that one could infer from Buchholz's mention of the polygraph suggested that he had passed it, because of the police actions that followed: namely, that law enforcement quickly eliminated Buchholz as a suspect and directed their focus to Appellant. *Id*. at 71. This inference was especially damaging, he argues, since the primary defense strategy was to offer Buchholz as an alternative suspect. Finally, he contends that the trial court's failure to administer a curative instruction to the jury until the end of the next day's testimony, rather than the beginning of the next day, was "too removed in time to rectify any prejudice caused by the error." *Id*. at 76.

In declining Appellant's motion for a mistrial, the trial court relied on the specific wording of the Commonwealth's narrow question, and found that the Commonwealth did not deliberately introduce the remark and that Buchholz's statement did not suggest a result. Trial Court Opinion, 5/9/18, at 43-45. Also, significant to the court's analysis was the fact that it offered to provide a cautionary instruction immediately, which the defense rejected. *Id*. at 45. We agree.

We note the following: "[n]ot every mention of a polygraph is prejudicial or worthy of a mistrial." *Fortenbaugh*, *supra* at 195. The reference was a

brief, isolated incident that was not solicited by the prosecutor's question.  The answer did not suggest the results of the polygraph examination, despite Appellant's attempt to construe Buchholz's answer in light of testimony that was elicited over the next sixteen days.  The trial court promptly offered to deliver a curative instruction, which the defense initially refused.  When it was subsequently requested to do so, the court delivered a thorough and accurate instruction.  Considering the circumstances, we find no abuse of discretion in the trial court's denial of a mistrial on this ground.  Accordingly, no relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/27/2019