2023 PA Super 176

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARQUICE DUPREE EVANS | : | |
| | : | |
| Appellant | : | No. 1093 WDA 2022 |

Appeal from the PCRA Order Entered September 6, 2022
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0000818-2010,
CP-25-CR-0000819-2010, CP-25-CR-0002901-2015

BEFORE:   PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                         **FILED: September 22, 2023**

Appellant Marquice Dupree Evans appeals from the September 6, 2022, order entered in the Court of Common Pleas of Erie County, which denied his first petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, following an evidentiary hearing.  After a careful review, we affirm.

The relevant facts and procedural history have been set forth previously by this Court, in part, as follows:

> On the evening of June 22, 2015, K.J. and his cousin, J.D., spent the night with their great-grandmother, Sherry Lyons.  The next afternoon, the granddaughter of one of Ms. Lyons' friends, Teonia Kimbro, visited Ms. Lyons' home.  Ms. Kimbro arrived on a bicycle.

---

[*] Former Justice specially assigned to the Superior Court.

Kimbro left Ms. Lyons' home shortly after arriving, but she returned about ten minutes later asking for a cup of water. Kimbro left her bicycle in Ms. Lyons' backyard. At some point, J.D. asked his great-grandmother if he and K.J. could go to Mighty Fine Doughnuts. Ms. Lyons consented, gave Kimbro her bank card, and asked Kimbro to accompany the boys.

The three left Ms. Lyons' residence on foot and arrived at Mighty Fine Doughnuts where Kimbro purchased half a dozen doughnuts with Ms. Lyons' bank card. After they finished eating, they packaged the extra doughnuts to-go and walked to the Country Fair on the corner of 26th and State Street, across from Veteran's Stadium. J.D. and K.J. saw Kimbro attempting to use Ms. Lyons' bank card at the ATM machine inside the store.

After leaving the Country Fair on the corner of 26th and State Street, the three walked to a car lot on 26th Street. While there, K.J. recalled that a short, dark-skinned male with dreadlocks approached Kimbro. The man was wearing a black t-shirt and black shorts, and he arrived on the same bike Kimbro left at Ms. Lyons' home. K.J. believed the male was Kimbro's friend, but stated the two argued, and the man left the car lot quickly.

Instead of taking K.J. and J.D. back to their great-grandmother's house, Kimbro took K.J. and J.D. to a park on 23111 Street, and then to the Dollar General across the street from Mighty Fine Doughnuts, despite their requests to return to Ms. Lyons' home. While at Dollar General, the children asked Kimbro to buy them candy. Kimbro told the children she couldn't because she "lost" Ms. Lyons' bank card. After leaving the Dollar General, Kimbro took K.J. and J.D. to a McDonalds on 26th Street, stating her phone was dying and she needed to call someone. While at the McDonalds, Kimbro used a landline phone and K.J.'s cell phone to place a call.

Subsequently, Kimbro took the children to a friend's home at the intersection of East 6th and State Streets. While there, K.J. noticed the same man who met Kimbro at the car lot arrived on the same bike, but he noticed he was wearing different clothing.

Shortly after 8:00 p.m., K.J.'s mother, Talaysha, saw the children outside a corner store near East 6th and State Streets when she was on her way to pick up some items at a nearby shop. She also saw [Appellant] outside the store. Instead of taking the children back to Ms. Lyons' home, Talaysha took the children to her home. Once K.J. and J.D. reached Talaysha's home, K.J. told his mother Kimbro lost his great-grandmother's bank card. After

learning K.J. knew where to find Kimbro, Talaysha sent him to retrieve the card. However, K.J. was unable to recover it.

Talaysha testified that, before she found the children, she attempted to reach Ms. Lyons just before 8:00 p.m. However, Ms. Lyons did not answer the phone. Once Talaysha and the children arrived home, Talaysha called Ms. Lyons again. No one answered. Talaysha became worried and called her aunt, Darlene, who had a key to Ms. Lyons' home.

Talaysha, Darlene, and several of Ms. Lyons' nieces arrived at Ms. Lyons' home around 11:00 p.m. Talaysha testified the family saw blood around the entryway of the home and on the floor as soon as they entered the residence. When the family entered the living room, they saw more blood on the carpet near the couch and on the wall, but no signs of Ms. Lyons. The family searched the upper floors of the home for Ms. Lyons with no success. The family then directed their search to the basement.

Talaysha testified she saw more blood at the top of the basement stairs and a large hole in the wall at the foot of the stairs. A pool of blood was beneath the hole.

The family found Ms. Lyons in one of the back basement rooms. Ms. Lyons was lying on her back with her shirt pulled up around her middle, a television on her chest, and one leg in the air. Duct tape was wrapped around Ms. Lyons covering her eyes, nose, and mouth. The family found Ms. Lyons' cordless phone had been running for six and a half hours, close to the last time a neighbor saw her sitting on her front porch.

Various members of the Erie Police Department were dispatched to the Lyons residence around 11:50 p.m. for a possible homicide. Detectives arrived at the scene at approximately 1:30 a.m. on June 24, 2015. Detective Kensil, one of the detectives on duty, took photographs of the Lyons residence capturing the blood pooling and blood splatter [sic] found throughout. Included in these photographs were pictures of a roll of duct tape found on the couch where blood was also present, and pieces of a broken, decorative wooden spoon. The detective also took a picture of the hole found at the bottom of the basement steps. He described the hole as being "about the size of a human head," and stated he saw drag marks left in blood on the basement carpet leading to the room where Ms. Lyons was found.

The detective also observed Ms. Lyons before she was taken for autopsy. He corroborated the family's testimony that her head

was wrapped in duct tape. In fact, the detective stated the tape covered Ms. Lyons' head so completely it was impossible to identify her. He also testified she appeared to have been beaten, and dragged by her legs, which explained the manner in which her shirt was rolled up from her waist. The detective observed a large TV on the ground next to Ms. Lyons' body.

Other evidence found at the home included a sweatshirt matching Ms. Lyons' clothing, two broken pieces of a wooden spoon, a Fago soda pop bottle, and a pizza crust. Several surfaces were processed for fingerprinting and DNA evidence including the front door and threshold, pill bottles, blood on various floor surfaces, walls, pieces of the wooden spoon, and duct tape. The detective also acquired a pair of white Nike shoes from [Appellant] when he was arrested. No forensic evidence was retrieved from the duct tape. Any other item recovered with potential evidence was sent to the PSP crime lab for analysis and verification.

After autopsy, the forensic pathologist concluded Ms. Lyons died from suffocating asphyxiation secondary to the application of multiple loops of duct tape around her face with a concurrent component of incapacitating blunt force trauma to the head. The doctor testified the blunt force trauma Ms. Lyons sustained could have been caused by the wooden spoon handle recovered from the crime scene. The fracture to her skull could have been consistent with an injury sustained after being thrown down a flight of stairs.

In addition to the injuries to Ms. Lyons' brain and skull area, the doctor found several contusions on the inside of her calves and on her right upper arm, which he described as "fingertip contusions." The doctor also found brush burn abrasions in the middle of Ms. Lyons' lower back, which he described as "rug burn," rib fractures, and a disruption of the bone between her right collar bone and the sternum of her breastbone. The doctor explained these fractures would be consistent with a large, heavy object, such as a TV, being placed on Ms. Lyons' chest. It was also the doctor's opinion that at the time the TV was placed on Ms. Lyons' chest she was alive.

Of the pieces of evidence submitted to the forensic lab, Tim Gavell, a forensic scientist with the Pennsylvania State Police DNA Lab, matched DNA lifted from the spoon handle to Ms. Lyons and [Appellant]. No other DNA was present on the spoon handle. Gavell also confirmed the blood splatter [sic] found on the living room wall matched Ms. Lyons' DNA. The DNA found on the Fago

pop bottle submitted to the lab provided only a partial profile, and matched someone in [Appellant's] paternal lineage.

Detective Lorah testified K.J. identified [Appellant] as the man he saw with Kimbro from a picture line up shortly after the police investigation began. Juan Garcia, [Appellant's] cousin, identified Kimbro as [Appellant's] "baby mom."

Video footage and bank records were recovered from various places of business and a Northwest Savings bank, which placed Ms. Lyons' bank card in [Appellant's] hands after he was seen with Kimbro in the car parking lot, and after Ms. Lyons' death. Bank statements confirmed a transaction at Mighty Fine Doughnuts, and also showed a denied attempt to withdraw $500.00 from an ATM at the Country Fair located at 26th and State Streets at 5:12 p.m. After this attempt, another was made in the amount of $200.00 at the same Country Fair at 5:32 p.m. Another withdrawal attempt was made at the Country Fair located at 802 East Avenue for $150.00 around 7:52 p.m., with another denied at that same location a half hour later. [Appellant] was also seen making a purchase around 10:30 p.m. at the Shell gas station on 6th and Parade. The video footage recovered from these locations showed Kimbro using the bank card at the 26th and State Street Country Fair, and [Appellant] attempting to withdraw funds with that card at the other locations.

Text messages were also recovered from Kimbro's cell phone after she was taken into custody linking [Appellant] to Ms. Lyons' death and the use of her bank card. In Kimbro's phone, police found a conversation she had with a contact named "Quice" that named him as the father of her child, a picture of a positive pregnancy test, and "selfies" of one person being sent to the other. Many of the messages referenced bank transactions associated with Ms. Lyons' card that occurred on June 19th.

Other messages directly referenced Ms. Lyons' murder including those which read: "Either you going to kill this bitch before the 1st or you going to give it back;" "Okay. You got my word. She a goner;" and "go over there and handle that quietly." Others asked one if the other knew whether Ms. Lyons' door was unlocked. One message stated they had to kill [Ms. Lyons] before she went to the police about getting her money back. Call records also showed the number associated with "Quice" called Kimbro's phone at the time [Appellant] used the victim's ATM card at a Northwest Savings Bank, and 22 other times on June 23, 2015.

Coincidentally, the phone number associated with the "Quice" contact disappeared once Kimbro was taken into custody.

Finally, Christopher Hazel, an inmate at SCI Westmoreland, testified about the last contact he had with [Appellant]. Hazel testified [Appellant], whom he casually knew as "Quice," contacted him in the middle of June 2015, telling him he was going to visit him in Pittsburgh soon. Eventually, the two met at a Greyhound bus station in Pittsburgh. Hazel testified [Appellant] told him he was in trouble up in Erie County, that he ["]caught["] a homicide, and the police found the body within five hours of when he did it. [Appellant] also told Hazel he bashed the victim's face in and only got $400.00 off the victim's debit card before the police froze the account.

According to Hazel, [Appellant's] "baby mom" was in jail for the offense and agreed to "take the case" for him. Originally, [Appellant] told Hazel his girlfriend was going to try to distract the victim, and he was going to sneak up on her and choke her so they could steal her credit card, but the plan didn't work because the victim saw [Appellant's] face. [Appellant] described the injuries he caused to the victim as being "horrendous and the gruesomest [*sic*] murder ever seen in Erie, Pennsylvania." [Appellant] also told Hazel it was his girlfriend's plan to steal the money, and, if necessary, kill the victim.

***Commonwealth v. Evans***, No. 1925 EDA 2016, at 1-6 (Pa.Super. filed 2/26/18) (unpublished memorandum) (bold omitted) (citation omitted).

Following a two-day trial, at docket number CP-25-CR-0002901-2015 ("2901-2015"), a jury convicted Appellant of various charges, including first-degree murder.[1]

_____

[1] On July 6, 2010, Appellant pled guilty at docket number CP-25-CR-0000818-2010 ("818-2010") to one count of flight to avoid apprehension, and at docket number CP-25-CR-0000819-2010 ("819-2010"), to one count of aggravated assault with a deadly weapon. The crimes related to these docket numbers occurred prior to the 2015 murder of Ms. Lyons, and Appellant was on

*(Footnote Continued Next Page)*

He was sentenced to an aggregate of life in prison, plus 38 years and five months to 77 years in prison. Appellant filed a post-sentence motion, which was granted, in part, and denied, in part. Specifically, the trial court modified Appellant's sentence to an aggregate of life in prison, plus 25 years and six months to 51 years and one month in prison.[2]

Appellant filed a timely direct appeal wherein he averred the trial court erred in denying his pre-trial motion seeking to limit and/or suppress the statements made by his co-defendant, Kimbro, and the text messages. After a careful review, we found no merit to Appellant's claims, and, thus, we affirmed. Appellant filed a petition for allowance of appeal, which our Supreme Court denied on September 5, 2018. Appellant did not file a petition for a *writ of certiorari* with the United States Supreme Court.

On January 2, 2019, Appellant filed a timely, *pro se* PCRA petition, and the PCRA court appointed counsel to assist Appellant. Counsel filed an amended PCRA petition on behalf of Appellant on October 21, 2019, asserting various claims of trial counsel ineffectiveness. On October 30, 2019, the PCRA court provided Appellant with notice of its intent to dismiss the petition under

---

probation when he murdered Ms. Lyons. Consequently, on November 10, 2016, after Appellant was convicted by the jury for the murder of Ms. Lyons, the trial court revoked Appellant's probation at 818-2010 and 819-2010, and resentenced Appellant.

[2] This sentence was imposed consecutively to the probation revocation sentences imposed at 818-2010 and 819-2010.

Pa.R.Crim.P. 907 on the basis that Appellant's "claims have been previously litigated and addressed in the [trial court] opinions[.]" Appellant filed an objection to the PCRA court's Rule 907 notice. On November 19, 2019, the PCRA court dismissed Appellant's PCRA petition, and Appellant appealed to this Court.

On appeal, this Court concluded that, as a matter of law, the PCRA court erred in determining Appellant's claims of trial counsel's ineffectiveness had been previously litigated. Accordingly, we vacated the PCRA court's November 19, 2019, order, and remanded for further proceedings. *See Commonwealth v. Evans*, 1865-67 WDA 2019 (Pa.Super. filed 3/8/21) (unpublished memorandum).

Upon remand, the PCRA court held an evidentiary hearing on October 25, 2021, regarding Appellant's claims of ineffective assistance of counsel. Following the hearing, the PCRA court provided the parties with the opportunity to file briefs. On September 6, 2022, the PCRA court filed an order denying Appellant's PCRA petition. This timely appeal followed,[3] and all Pa.R.A.P. 1925 requirements have been adequately met.

_____

[3] We note that Appellant filed a single notice of appeal listing three separate trial court docket numbers, including 818-2010, 819-2010, and 2901-2015. In *Commonwealth v. Walker*, 646 Pa. 456, 185 A.3d 969 (2018), our Supreme Court held that an appellant is required to file separate notices of appeal when a single order resolves issues arising on more than one trial court docket. However, in the case *sub judice*, we conclude a breakdown occurred in the PCRA court, which permits us to overlook Appellant's non-compliance
*(Footnote Continued Next Page)*

On appeal, Appellant sets forth the following issues in his "Statement of the Questions Presented" (verbatim):

(1)     The trial court erred in failing to find that trial counsel was ineffective for failing to file a motion arguing that the lack of an affidavit of probable cause in this case resulted in an illegal arrest, and thus that the testimonial evidence obtained as a result of that arrest should have been suppressed.

(2)     The trial court erred in failing to find that trial counsel was ineffective in failing to file a motion for DNA testing of the tape that was over the victim's face.

Appellant's Brief at 1-2 (bold omitted).

Initially, we note our standard of review for an order denying PCRA relief is limited to whether the record supports the PCRA court's determination, and whether that decision is free of legal error. **Commonwealth v. Sattazahn**, 597 Pa. 648, 952 A.2d 640, 652 (2008). "We must accord great deference to the findings of the PCRA court, and such findings will not be disturbed unless they have no support in the record." **Commonwealth v. Scassera**, 965 A.2d 247, 249 (Pa.Super. 2009) (citation omitted).

_____

with **Walker**. Specifically, the PCRA Court's September 6, 2022, order provided "this represents the Final Order with respect to this matter, Petitioner is hereby notified that he has thirty (30) days from the date of this Order to file his Notice of Appeal." The language in the PCRA court's order refers to a singular notice of appeal, and it does not correctly inform Appellant that three separate notices of appeal should be filed. Accordingly, we conclude there was a breakdown in the court and proceed to examine the merits of Appellant's appeal. **See Commonwealth v. Larkin**, 235 A.3d 350, 352-54 (Pa.Super. 2020) (*en banc*).

Moreover, as relevant here, a PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). In reviewing Appellant's ineffective assistance of counsel claims, we are mindful that, since there is a presumption counsel provided effective representation, the defendant bears the burden of proving ineffectiveness. *Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282 (2010).

To prevail on an ineffective assistance claim, a defendant must establish "(1) [the] underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his [client's] interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." *Id.*, *supra*, 10 A.3d at 291 (citations omitted).

> We need not analyze the prongs of an ineffectiveness claim in any particular order. Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case. [C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.

*Commonwealth v. Johnson*, 635 Pa. 665, 139 A.3d 1257, 1272 (2016) (citations omitted). *See Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 419 (2009) ("A failure to satisfy any prong of the ineffectiveness test

- 10 -

requires rejection of the claim of ineffectiveness.") (citation omitted)).  "A claim has arguable merit where the factual averments, if accurate, could establish cause for relief."  *Commonwealth v. Stewart*, 84 A.3d 701, 707 (Pa.Super. 2013) (*en banc*) (citation omitted).

Regarding the reasonable basis prong of the ineffective assistance of counsel test, our Supreme Court has relevantly stated the following:

> When assessing whether counsel had a reasonable basis for his act or omission, the question is not whether there were other courses of action that counsel could have taken, but whether counsel's decision had any basis reasonably designed to effectuate his client's interest….[T]his cannot be a hindsight evaluation of counsel's performance, but requires an examination of "whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect [the] defendant's interests."  Our evaluation of counsel's performance is "highly deferential."

*Commonwealth v. Williams*, 636 Pa. 105, 141 A.3d 440, 463 (2016) (citations and quotations omitted).

Further,

> To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.  [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.

*Commonwealth v. Spotz*, 624 Pa. 4, 84 A.3d 294, 311-12 (2014) (citations, quotation marks, and quotations omitted). *See Commonwealth v. Gribble*, 580 Pa. 647, 863 A.2d 455, 472 (2004) ("[A] defendant [raising a claim of ineffective assistance of counsel] is required to show actual prejudice; that is,

that counsel's ineffectiveness was of such magnitude that it could have reasonably had an adverse effect on the outcome of the proceedings.") (quotation omitted)).

With these relevant legal precepts in mind, we turn to the specific issues raised by Appellant.

In his first issue, Appellant contends he "was arrested in July of 2015 regarding the homicide charges before a criminal complaint had been filed against him and before a warrant was issued for his arrest." Appellant's Brief at 17. He contends that since the criminal complaint did not contain an affidavit of probable cause his arrest must be deemed illegal. He also suggests that his statements, which he made to the Erie County police while he was in custody, must be suppressed due to the alleged illegal arrest arising from the defective complaint. Accordingly, Appellant argues trial counsel was ineffective in failing to file a pre-trial motion challenging the legality of Appellant's arrest, as well as the statements flowing therefrom as fruit of the poisonous tree, due to the alleged defective complaint.

Initially, we note Appellant has cited no relevant authority in support of his argument. In any event, in rejecting Appellant's ineffective assistance of counsel claim, the PCRA court relevantly indicated the following:

> [Appellant] argues that trial counsel was ineffective for failing to file a suppression motion based on the fact that the murder complaint did not have an affidavit of probable cause attached to it.
>
> This claim is not of arguable merit and counsel had a reasonable basis. At the [PCRA] evidentiary hearing, [trial

- 12 -

counsel] addressed why he did not file a pre-trial motion addressing the lack of an affidavit of probable cause.

\*\*\*

Q. Did you actually consider it and reject it or did you just not consider it at all in terms of seeking to suppress certain evidence based on the lack—an [alleged] illegal arrest?

A. I mean, everything is considered. I can't tell you exactly what I thought of at that time. I know in my discussions with [Appellant], we talked about those types of things, but if I was to look back on it, I did not see legal grounds.

N.T., 10/25/21, [PCRA hearing], at 8.

[Appellant] argues that the lack of an affidavit [of probable cause attached to the complaint] somehow made his [previous] statements inadmissible, and thus he seeks to suppress statements he made at the time of his arrest in July of 2015. Significantly, [at the time Appellant spoke to Erie County police regarding the homicide of Ms. Lyons], he had been arrested [and was already in custody] on an [unrelated] bench warrant issued in June of 2015 [in Butler County]. He thereafter was told about the possible homicide charges and was interviewed [by Erie County police]. He voluntarily waived his **Miranda**[4] rights, and he made [incriminating] statements that were used against him.

At the [PCRA] evidentiary hearing, [trial counsel] set forth his reasoning for not filing a "frivolous" motion to suppress [Appellant's] statements to the Erie Police:

Q. Why do you think that would be frivolous under [Appellant's] case?

A. Because he was [in custody already] and arrested by a police agency, not the Erie Police Department, on totally unrelated circumstances and voluntarily talked to them when they called to meet with him. I mean, the Erie police were called to go to the other county.

Q. Before he spoke with them, is it your recollection that he signed that **Miranda** waiver?

A. It's clear from the document, yes.

_____

[4] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602 (1966).

- 13 -

N.T., 10/25/21, [PCRA hearing], at 19.

The homicide complaint was not even presented to [Appellant] until August 19, 2015, [which is well after he made the incriminating statements]. Even if the complaint was insufficient, it would not warrant suppression of the statements, which [Appellant] voluntarily made more than one month earlier.

[Trial counsel] obviously recognized that the lack of an affidavit [of probable cause attached to the complaint] was not a basis to suppress the statements. Moreover, [trial counsel] reviewed the complaint, and concluded that, based on his 33 years' experience, it contained sufficient probable cause, even without a separate attached affidavit. [N.T., 10/25/21, PCRA hearing, at 46-47.] He, therefore, reasonably concluded any action to suppress would be frivolous. Therefore, [there is no merit to Appellant's claim,] and counsel had a reasonable basis for his action.

PCRA Court Opinion, filed 8/12/22, at 4-5 (footnote added).

We find no abuse of discretion or error of law. As the PCRA court noted, Appellant was already in custody on unrelated charges when he spoke to the Erie County police about the homicide of Ms. Lyons. Appellant does not dispute he voluntarily waived his *Miranda* rights prior to being questioned about the homicide of Ms. Lyons. Rather, Appellant suggests the alleged defective complaint, which was filed after he spoke to the police, somehow negates the voluntary nature of his statements and/or requires the conclusion he was illegally arrested such that the charges filed against him in connection with Ms. Lyons' homicide should have been dismissed.

To the extent Appellant treats the voluntariness of his statements and the validity of the complaint subsequently filed against him as one and the same issue, we dispense with this based on the trial court's well-reasoned

- 14 -

analysis as set forth *supra*. Simply put, Appellant has neither demonstrated nor cited relevant authority for the proposition that the voluntariness of his prior police statements is negated by the alleged defects in the complaint.

To the extent Appellant contends the complaint's lack of an affidavit of probable cause requires the conclusion he was illegally arrested such that the charges filed against him in connection with Ms. Lyons' homicide should have been dismissed,[5] we note our Supreme Court has held that "any issue concerning a defect [regarding] the affidavit of probable cause becomes moot upon the district justice's finding at the preliminary hearing that a *prima facie* case has been established." ***Commonwealth v. Chamberlain***, 612 Pa. 107,

_____

[5] Moreover, we note that, in ***Commonwealth v. Davis***, 454 A.2d 92 (Pa.Super. 1982), this Court held that alleged defects in a complaint did not invalidate an appellant's warrantless arrest, which was supported by probable cause. This Court recognized that "[a] warrantless arrest for a felony will be upheld where police have probable cause to believe (1) that a felony has been committed, and (2) that the person to be arrested is the felon." ***Davis***, 454 A.2d at 95 (citation omitted). We further noted that "probable cause is said to exist where facts and circumstances within the knowledge of the arresting officer are reasonably trustworthy and sufficient in themselves to warrant a man of reasonable caution to believe that the person to be arrested has committed the offense." ***Id.*** (citation omitted).

In the case *sub judice*, as indicated *supra*, Appellant was in custody on unrelated charges when he made incriminating statements and the instant complaint for the homicide case was filed against him. In any event, the police had ample probable cause linking Appellant to Ms. Lyons' homicide. For instance, the police interviewed J.D. and K.J. the day after the homicide, and K.J. chose Appellant's photo from an array. N.T., 9/27/16, Trial, at 119-21. The police also secured the text messages between Kimbro and Appellant, as well as secured video surveillance of Appellant and Kimbro using Ms. Lyons' ATM card on the day of and after the murder. ***Id.*** at 128-61. Thus, there is no arguable merit to Appellant's underlying claim. ***See Johnson***, ***supra***.

- 15 -

30 A.3d 381, 422-23 (2011). Such occurred in the case *sub judice*. Accordingly, we find Appellant is not entitled to relief on his ineffective assistance of counsel claim. **See Johnson**, **supra**.

In his next issue, Appellant claims trial counsel was ineffective in failing to hire an expert to examine the duct tape for DNA evidence. He contends he asked trial counsel to hire an expert to conduct such testing; however, trial counsel failed to do so.

Relevantly, this Court has held:

> In order to demonstrate counsel's ineffectiveness for failure to call a witness, a petitioner must prove that the witness [ ] existed, the witness [was] ready and willing to testify, and the absence of the witness' testimony prejudiced petitioner and denied him a fair trial. In particular, when challenging trial counsel's failure to produce expert testimony, "the defendant must articulate what evidence was available and identify the witness who was willing to offer such evidence." **Commonwealth v. Bryant**, 579 Pa. 119, 855 A.2d 726, 745 (2004) (internal citation omitted).

**Commonwealth v. Luster**, 71 A.3d 1029, 1047 (Pa.Super. 2013) (*en banc*) (quotation marks, quotation, and citations omitted).

In the case *sub judice*, during the PCRA hearing, trial counsel testified the Commonwealth's expert attempted to retrieve DNA evidence from the duct tape, but no DNA evidence was recovered. N.T., 10/25/21, PCRA hearing, at 44-45. Appellant has failed to identify any forensics expert who would have provided testimony to counter the Commonwealth's expert's findings. Thus, there is no arguable merit to the underlying claim. **See Stewart**, **supra**.

Further, we agree with the PCRA court that Appellant has failed to demonstrate he was prejudiced by counsel's omission. In this vein, the PCRA court indicated:

The [PCRA] court also notes that even if there was a DNA test, there is not a reasonable probability the outcome [of the trial] would have been different. Indeed, [depending on the DNA findings], it may have benefitted the Commonwealth. As it [stood], [Appellant] [was able to argue at trial] that the Commonwealth did not present any evidence that his DNA was on the [duct] tape. However, [further forensic] testing could have resulted in [Appellant's] DNA on the tape or no one's DNA on the tape. Moreover, [during the PCRA hearing, trial counsel] testified that he did not believe that this was a significant issue.

Q. Okay. Would you agree with me if his DNA was or was not on that [duct tape] mask [found on the victim's face], that would have been a crucial piece of evidence?

A. No, not a crucial part because there was other evidence; the text messages, there was DNA on the decorative spoon, a pizza crust that was at the scene, and a couple of other things.

N.T., 10/25/21, PCRA hearing, at 44-45.

PCRA Court Opinion, filed 8/12/22, at 7-8.

Here, given the extensive evidence that Appellant was the perpetrator of the homicide, we agree with the PCRA court that Appellant has failed to demonstrate that, but for counsel's omission in having an expert test the duct tape for DNA evidence, the outcome of Appellant's trial would have been different. *See Gribble*, *supra*. Thus, Appellant is not entitled to relief on his claim of ineffective assistance of counsel.

For all of the foregoing reasons, we affirm.

Affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/22/2023