J-A26011-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL MARTIN | : | |
| | : | |
| Appellant | : | No. 1434 WDA 2023 |

Appeal from the PCRA Order Entered November 8, 2023
In the Court of Common Pleas of Washington County Criminal Division at
No(s):  CP-63-CR-0002923-2017

BEFORE:  BOWES, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BOWES, J.:                    **FILED: MARCH 6, 2025**

Michael Martin appeals from the order that dismissed without a hearing his petition filed pursuant to the Post Conviction Relief Act ("PCRA"). We affirm.

The pertinent history of this case is as follows.[1] In the early morning hours of December 6, 2016, Gerald Greenawalt found his adult daughter Stacey ("Victim") unresponsive on the bathroom floor of his home in Washington County, Pennsylvania. Emergency medical personnel were unable to revive her. It was later determined that Victim died from a combination of heroin and fentanyl.

---

[1] The trial court's thorough summary of the procedural history and trial testimony included in its July 31, 2019 order disposing of Appellant's post-sentence motion informed our more truncated synopsis herein. **See** Order, 7/31/19, at 2-9.

Pennsylvania State Police ("PSP") Trooper Sarah Teagarden reported to the scene and recovered from the bathroom drug use paraphernalia and stamp bags marked with green dollar signs containing what was later determined to be heroin and fentanyl. Mr. Greenawalt told the trooper that he knew where Victim had been and obtained the drugs and had been in the days preceding her death, namely the home of Jennifer Greene, which is where he said that Victim always went when she was going to use drugs. He indicated that, in this instance, Victim had left his house on foot on Friday, December 2 and returned, under the influence, on the evening of Monday, December 5, 2016.

Consequently, the PSP focused their investigation on Greene's two-bedroom residence in Marianna, Washington County, less than one mile from Victim's home. Greene lived there with her partner, George Briggs, who is Appellant's father. Appellant started coming to the house from Philadelphia in the summer of 2016 and utilized the spare bedroom. Samantha Howes, Greene's longtime friend who was working as Greene's home health care aid, would often sleep at the residence. Charles Pugh also resided on the property in a converted garage.

The PSP initially conducted a "trash-pull," *i.e.*, an examination of the refuse bags placed by the curb to be collected by sanitation workers. That search produced stamp bags with green dollar signs and drug distribution paraphernalia. Using this information, the PSP obtained a warrant to search

the Greene-Briggs residence.  Appellant, Greene, Howe, and Pugh were all in the house when the PSP executed the warrant on December 8, 2016.  Their search resulted in the seizure of cocaine, marijuana, a digital scale, various size baggies, unused stamp bags, and the residents' cell phones.

Appellant was charged with a multitude of offenses including drug delivery resulting in death ("DDRD"), possession with intent to deliver ("PWID"), and conspiracy to commit PWID.  He proceeded to a jury trial in March 2020 at which Trooper Teagarden, Greene, Howes, Pugh, and other witnesses familiar with drug activities within Greene's home testified to the following facts.

Greene and Briggs operated the residence they leased together as a drug house from which they illicitly sold a variety of pills such as Xanax and Percocet.  They did not commence selling heroin until Appellant began staying there in August 2016.  Thereafter, Briggs, Greene, and Howes would drive to Philadelphia to pick up Appellant and his heroin supply, which was packaged either in blue stamp bags or white ones with green dollar signs.  The four of them and Pugh would then sell the heroin from the Marianna residence, where Appellant stored it in his bedroom.  When the heroin ran out, Appellant would take a bus back to Philadelphia and the cycle began anew.

Briggs and Greene let their customers know that heroin would be available for sale in December 2016.  For example, Ashley Pierson went to the house at that time to purchase heroin packaged in white stamp bags with

green dollar signs that Greene retrieved from Appellant's bedroom. On December 2, 2016, Robbie Huber purchased heroin in green-dollar-sign bags at the drug house, went into the bathroom to inject it, and, when he was in there for a long time, was found unconscious on the floor by Howes. She and Pugh were able to revive him.

Victim struggled with addiction to heroin and cocaine. She frequented the Greene-Briggs house both before and after she moved into her father's house with her sons in July 2016 after completing rehabilitation in Erie. Victim became fond of Appellant and would spend evenings with him at the drug house, either on the living room couch or in Appellant's bedroom. Victim spent the whole weekend before her death with Appellant in this fashion, returning to her father's home on the evening of December 5, 2016.

The residents of the drug house learned of Victim's death the following day. Appellant was upset, indicating that he needed to know what type of heroin stamp bags she had taken home. Expecting that the police would be coming to the house, he and the others gave some of the drugs to Greene's son to take elsewhere, and Appellant flushed crack cocaine down the toilet. Nonetheless, the subsequent searches of the home and the contents of Appellant's cell phone produced evidence, *inter alia*, that on December 2, 2016, Appellant texted customers when he returned to Washington County to set up drug deals; that he communicated with Victim about her sending him

customers; and that Victim told Appellant that she would go to the Marianna house once her father returned home to be with her children.

Upon this evidence, the jury found Appellant guilty of all charges. The trial court impose an aggregate term of fifteen to thirty years of imprisonment, and Appellant's direct appeal from that judgment of sentence merited no relief. *See Commonwealth v. Martin*, 253 A.3d 258, 2021 WL 1259516 (Pa.Super. 2021) (non-precedential decision), *appeal denied*, 269 A.3d 1225 (Pa. 2021).

Appellant filed a timely *pro se* PCRA petition. The court appointed counsel, who filed an amended petition raising claims of ineffective assistance of trial counsel. By order of October 4, 2023, the court issued notice of its intent to dismiss the petition without a hearing pursuant to Pa.R.Crim.P. 907. Appellant filed a response which did not persuade the PCRA court to refrain from dismissing his petition on November 8, 2023. Appellant timely appealed.[2]

Appellant presents the following questions:

1. Did the PCRA court err when it dismissed [Appellant]'s claim that [trial counsel] provided ineffective assistance of counsel in failing to object to inadmissible hearsay and act-propensity evidence without a hearing?

2. Did the PCRA court err when it dismissed [Appellant]'s claim that [trial counsel] provided ineffective assistance of counsel

---

[2] The PCRA court did not order Appellant to file a Pa.R.A.P. 1925(b) statement, and none was filed. However, the court's reasoning for its ruling is detailed in its October 4, 2023 notice of intent to dismiss.

by failing to request a jury instruction for the element of the locus of delivery without a hearing?

3. Did the PCRA court err when it dismissed [Appellant]'s claim that [trial counsel] provided ineffective assistance of counsel in failing to challenge the sufficiency of the evidence for the element of the locus of delivery without a hearing?

Appellant's brief at 4.

We begin with the governing legal tenets. "[W]e review an order dismissing or denying a PCRA petition as to whether the findings of the PCRA court are supported by the record and are free from legal error." *Commonwealth v. Howard*, 285 A.3d 652, 657 (Pa.Super. 2022) (cleaned up). Overall, "[i]t is an appellant's burden to persuade us that the PCRA court erred and that relief is due." *Commonwealth v. Stansbury*, 219 A.3d 157, 161 (Pa.Super. 2019) (cleaned up).

Appellant's issues all question whether his trial counsel rendered a constitutionally deficient performance. To obtain relief based upon ineffective assistance of counsel, a PCRA petitioner must establish each of the following elements:

(1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness, *i.e.* there is a reasonable probability that but for the act or omission in question the outcome of the proceeding would have been different.

*Commonwealth v. Grayson*, 212 A.3d 1047, 1054 (Pa.Super. 2019) (cleaned up). We have explained that "[a] claim has arguable merit where the factual averments, if accurate, could establish cause for relief."

- 6 -

*Commonwealth v. Evans*, 303 A.3d 175, 182 (Pa.Super. 2023) (cleaned up). "To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." *Id*. (cleaned up).

A court need not examine the elements of ineffectiveness test in order, bur may reject the claim is it apparent that it fails any one element. **See**, *e.g.*, *Commonwealth v. Rivera*, 199 A.3d 365, 374 (Pa. 2018). Further, a petitioner has no absolute right to a hearing, and the court can dismiss the petition without one if it is apparent from the record that there are no issues of material fact regarding whether PCRA relief is warranted. **See**, *e.g.*, *Commonwealth v. Smith*, 244 A.3d 13, 16 (Pa.Super. 2020).

Although Appellant states three separate claims of ineffective assistance of trial counsel, they are all interrelated and concern the Commonwealth's proof of his DDRD conviction. Our General Assembly defined the offense of DDRD thusly: "A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of [35 P.S. § 780-113(a)(14) or (30)], and another person dies as a result of using the substance." 18 Pa.C.S. § 2506(a).

Section 780-113(a) of the Drug Act, in turn, prohibits enumerated "acts and the causing thereof **within the Commonwealth**," including "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance." 35 P.S. § 780-113(a)(30) (emphasis added). Accordingly, as our Supreme Court held in **Commonwealth v. Peck**, 242 A.3d 1274 (Pa. 2020), the crime of DDRD is not established if the drug that caused a person's death was delivered to the decedent outside of the Commonwealth. **Id**. at 1285 ("Because the Drug Act, by its express terms, is violated only by a drug delivery that occurs within Pennsylvania, and because the Commonwealth does not dispute that the drug delivery in this case took place in Maryland, the Commonwealth failed to meet its evidentiary burden.").

The statute does not require that the defendant directly deliver the drugs to the person who died. **See Commonwealth v. Storey**, 167 A.3d 750, 757 (Pa.Super. 2017) ("Section 2506(a)] does not require the death of the person to whom the defendant originally sold the illegal substance."). Rather, it is a question of "but for" causation, with the caveat that the result must not have been "so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." **Commonwealth v. Kakhankham**, 132 A.3d 986, 993 (Pa.Super. 2015) (cleaned up).

Seizing upon the **Peck** decision, which was handed down more than one and one-half years after his trial, Appellant asserts that trial counsel was ineffective because he neither requested that the judge instruct the jury that they had to find beyond a reasonable doubt that Appellant delivered the drug to Victim in Pennsylvania, nor challenged the sufficiency of the Commonwealth's proof that Appellant did so in a post-sentence motion or on direct appeal.[3]  He observes that, since Victim was with him all weekend, they had time to walk to West Virginia, Ohio, or Maryland, and "could have driven to every state east of the Rocky Mountains, as well as the Canadian provinces of Saskatchewan, Manitoba, Ontario, Quebec, New Brunswick, and Nova Scotia."  Appellant's brief at 38.  He suggests that, had trial counsel requested the instruction, "there is at least a reasonable probability that at least one juror could have determined that the Commonwealth had not met its burden of persuasion, and that [Appellant] could have obtained a mistrial or an acquittal."  **Id**. at 38-39

Appellant further maintains that "the **only** evidence as to where [Victim] obtained the specific drugs that caused her death" was Trooper Teagarden's hearsay testimony about what Mr. Greenawalt told her.  **Id**. at 29 (emphasis in original).  He argues that counsel was ineffective in failing to object to that testimony as both "clear, rank hearsay" and propensity evidence inadmissible

_____

[3] Trial counsel's representation continued through the direct appeal.

to prove that Victim bought the drugs from the residents of the Greene-Briggs house in this instance. *See* Appellant's brief at 25-27. He concedes that there was no hearsay violation to the extent that the statements were offered to explain why the investigation targeted the Marianna drug house, but posits that an instruction was necessary to explain to the jury the limited purpose for which it could consider the information. *Id*. at 25 n.1, 28.

Upon thorough review, we are wholly unpersuaded that Appellant is entitled to relief on any of his claims, individually or cumulatively.[4] We begin by affirming that Trooper Teagarden's testimony recounting Mr. Greenawalt's out-of-court statements was **not** the only evidence directly linking Victim's death to the Greene-Briggs drug house. Indeed, Mr. Greenawalt himself testified at Appellant's trial, told the jury exactly what he told Trooper Teagarden, admitted that he had never been to the house, and was cross-examined about his knowledge regarding where Victim obtained the drugs. *See* N.T. Trial, 3/18/19, at 116-21.

We next observe that Trooper Teagarden's recitation of those out-of-court statements was, as Appellant concedes, admissible to explain why the PSP's investigation immediately focused on the Greene-Briggs residence. *See*, *e.g.*, *Commonwealth v. Wade*, 226 A.3d 1023, 1033 (Pa.Super. 2020)

---

[4] To the extent that we conclude that his individual claims fail for lack of prejudice, Appellant requests that we examine the cumulative prejudice of counsel's deficient performance. *See* Appellant's brief at 37 n.2, 45 n.4.

- 10 -

("[I]t is well-established that an out-of-court statement offered, not for its truth, but to explain the witness's course of conduct, is not hearsay."). Without this testimony, the jury would not have understood why the PSP conducted the trash-pull that uncovered green-dollar-sign stamp bags from that house, which then led to the issuance of a warrant to search of the drug house. Hence, there is no arguable merit to the claim that the statements were objectionable as hearsay.

To the extent that Mr. Greenawalt's statements may have been objectionable, Appellant was not prejudiced by counsel's failure to do so or to request a limiting instruction, because the properly admitted evidence that Victim obtained the drugs that killed her from the Greene-Briggs house, and that Appellant was the person who delivered them there, was overwhelming. As summarized by the trial court in its order dismissing his post-sentence motions, text messages from Appellant's phone confirmed the various witnesses' testimony that he had returned to Washington County on December 2, 2016, to sell heroin that he obtained from Philadelphia, informed a host of people of this fact, and utilized the Marianna drug house and its occupants to make his sales. *See* Order, 8/2/19, at 24-27. Greene and Howes confirmed that Appellant was the operation's heroin source and that it was packaged in stamp bags with a dollar sign symbol. *See* N.T. Trial, 3/18/19, at 139,149-50; N.T. Trial, 3/19/19, at 49-50, 59-61. Customers Ms. Pierson and Mr. Huber confirmed the availability of that particular heroin for

purchase at the Greene-Briggs house on the first weekend in December, as well as the potency of the drug. **See** N.T. Trial, 3/19/19, at 24-27, 34-36. The dollar sign stamp bags were recovered by the PSP from the residence's trash, and were in Victim's purse when her father found her on the bathroom floor, having overdosed just as Mr. Huber had that weekend.

As for Victim's whereabouts in the days before she died, Howes testified that Victim was with Appellant Friday night, December 2, 2016, after he had just returned to Marianna from Philadelphia. Victim stayed there the whole weekend. On Saturday, she obtained the subject heroin from him and injected it with Howes in the bathroom. Victim was still at the drug house on Monday afternoon at 3:00 or 4:00 when Howes left. **See** N.T. Trial, 3/18/19, at 140-41, 143, 149-50. Mr. Greenawalt testified that Victim returned to his house that evening, "messed up," sometime between 7:00 and 9:00. **Id**. at 113. His wife heard Victim "fumbling around" in the bathroom around midnight, and she was still in there at 4:30 a.m. when he woke up. **Id**. at 114-15. He opened the bathroom door to find her face down on the floor. A needle and syringe were found under her body by the first-responders, and in her nearby purse was a zip lock bag containing white stamp bags with green dollar signs on them. **Id**. at 43.

Given this wealth of testimony placing Victim at the drug house with Appellant the entirety of that weekend, and identifying Appellant as the supplier of the green-dollar-sign heroin, his utterly unfounded supposition that

Victim could have obtained the lethal heroin from Appellant or someone else in Saskatchewan or Nova Scotia does not cause this Court to lose confidence in the verdict. It is plain to us that the result of the proceeding would have been the same even if the jury had not heard Mr. Greenawalt's representation that Victim got the drugs from the Greene-Briggs house.

Likewise, the trial court's failure to instruct the jury that it could not convict Appellant unless it was in Pennsylvania that Victim obtained the heroin from him, directly or indirectly, was harmless. Unlike in **Peck**, where it was uncontroverted that the defendant delivered the drugs outside of Pennsylvania, none of the evidence at trial suggested that Victim left Marianna, let alone the Commonwealth, during her the weekend with Appellant. Nor does Appellant allege that evidence of any extra-jurisdictional travel exists. As such, we are convinced beyond a reasonable doubt that the jury would have made the finding that Appellant delivered the drugs in Pennsylvania had it been asked. **Accord Commonwealth v. Cruz**, 320 A.3d 1257, 1276 (Pa.Super. 2024) (*en banc*) (explaining that the failure to submit an element to the jury does not warrant relief if the court is convinced that the error was harmless because, *e.g.*, the evidence of that element was uncontroverted or overwhelming).

Similarly, we do not hesitate to find that counsel would not have prevailed had he raised a sufficiency challenge targeting the locus of delivery element of DDRD. As detailed hereinabove, multiple witnesses testified that

Appellant delivered the dollar-sign stamp bags to the Pennsylvania drug house, and the circumstantial evidence amply supported the conclusion that it was the heroin-fentanyl mixture in those bags, obtained by Victim from someone in that house, that caused her death. **Accord Commonwealth v. Storey**, 167 A.3d 750, 758 (Pa.Super. 2017) (holding DDRD evidence was sufficient where the person who sold heroin to the victim testified that he bought it from the defendant in a casino parking lot in Pennsylvania, this testimony was corroborated by cell phone evidence, and the coroner found the distinctively-branded stamp bags in the victim's pockets).

For the above reasons, Appellant has not met his burden of persuading us that the PCRA court erred in dismissing his petition. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/6/2025

- 14 -